[Civ. No. 4121.   Fourth Dist.   Nov. 14, 1950.]

MAUDE WILLIAMS, Respondent, v. ROSE DOUGAN, Appellant.

Sarau, Adams, Neblett & Sarau and John Neblett for Appellant.

Wing, Wing & Brown and Merrill Brown for Respondent.

GRIFFIN, J.—Plaintiff filed this action to recover $19,-844.50, for claimed services rendered in boarding and caring for certain pets consisting of two sheep and their increase, five old horses, and eight dogs, from March 15, 1943, to September 15, 1947, or until they were removed from plaintiff's premises.

The complaint contained two counts. One was on an open book account and the other was for services rendered at the special instance and request of defendant for which defendant promised to pay plaintiff the reasonable value of such services.

The trial court, sitting without a jury, found as to the first count that it was not true that defendant became indebted to plaintiff, as alleged, upon a mutual, open book account. However, it did find as to the second count, that on September 15, 1947, defendant was indebted to plaintiff in the sum of $18,-178. A credit of $6,000 was allowed on that amount for payments previously made by defendant for certain supplies furnished by her toward the keep of the animals. In addition, the court allowed the sum of $786 for the board of one horse from September 15, 1947, to February 21, 1949. No allowance was made for the care of the sheep. Judgment was rendered accordingly and defendant appealed.

The evidence in reference to the arrangement for the board and care of the animals is in sharp conflict, and a close question arises as to whether plaintiff ever established the fact that defendant agreed to pay plaintiff the amount found due, and secondly, whether that was a reasonable amount or was exorbitant under the facts shown.

Plaintiff and defendant first met through a mutual friend, a Dr. Florilla White, about 16 years ago, at plaintiff's ranch, located near Beaumont. Dr. White then had some collie dogs at plaintiff's ranch, which were being cared for by plaintiff, and defendant knew that such boarding was not gratuitous. Plaintiff had several kennels in which she kept boarding animals as well as her own dogs, and such additional stray dogs as came to her. Defendant and Dr. White lived on the White ranch together for some time. Defendant also owned a 160 acre ranch near Indio. Both defendant and plaintiff were extremely fond of dogs and other animals and each de-

voted a great deal of attention and kindness toward them. Defendant was president of a humane society and stated that she "believed in reincarnation." She testified that plaintiff, for about 25 years, had taken in orphan and stray dogs upon her ranch in such number that she could not remember how many there were. Defendant believed she was caring for about 15 of them in 1934 when she visited her ranch.

Defendant testified that in appreciation of plaintiff's caring for orphan dogs and to assist her in this good work she, in May, 1942, voluntarily commenced making contributions to plaintiff of money and dog food. In March, 1943, Dr. White died. At that time she had three collie dogs at plaintiff's ranch. Later, one collie had six pups. The evidence is conflicting as to whether these pups were born as a result of plaintiff's negligence in allowing the collie to stray away for a period of two weeks or whether she was bred under Dr. White's supervision.

Apparently, the doctor's sister, who had charge of her estate, informed defendant that she was not going to take care of the dogs and that she was going to destroy them. Plaintiff testified that defendant came to her ranch and told her of this fact and that defendant said: "I won't stand for that. I am taking over the doctor's dogs, I am taking care of them just as nearly as I can as the doctor would, I am leaving them here." This statement was corroborated by another witness who testified that she heard defendant say: "Yes, I am taking care of the doctor's dogs and I am leaving them with Miss Williams." At the trial she added the statement that defendant intimated that plaintiff was to take care of the dogs on the same basis as she had done with Dr. White. These claimed conversations are the basis of plaintiff's claim that a contract, either express or implied, was entered into between herself and defendant for the care of Dr. White's dogs. Plaintiff never sent a bill to defendant for their board and care, and claims that defendant stated that she would pay plaintiff "after the war."

Plaintiff's testimony at the trial regarding her conversations with defendant, is somewhat in conflict with her testimony appearing in her deposition taken before trial in respect to this claimed conversation. She there testified that there was no agreement between them regarding the care of Dr. White's dogs; that defendant said "she was taking over Dr. White's dogs. . . . I am leaving them here"; and that she didn't remember that anything else was said; that no price was ever

discussed or mentioned; that in the presence of the afore-mentioned witness defendant said "she was taking over the doctor's dogs"; that there was no conversation about defendant paying for their care, but defendant said she "was responsible for the dogs"; that from "March, 1943, up until sometime in 1947, there was no conversation between" her and "Miss Dougan regarding the payment for Dr. White's animals" except as related; that there was never any conversation with defendant about defendant's furnishing food for them. She, however, admitted that defendant did, about September, 1943, furnish from 200 to 600 pounds of dog food and that defendant, in response to a demand, paid her $500 about July, 1943; that defendant had theretofore and thereafter given her money but that she never gave defendant a receipt for it and she was unable to furnish any record of such payments or of any definite charge being made against defendant over the entire period.

Defendant vehemently denies such a conversation and testified that at that time no discussion was had between the parties, as claimed, regarding the keeping of the doctor's dogs; that later, in May, she went to plaintiff's ranch and at that time gave plaintiff $30 to help her in caring for those dogs and that in June, 1943, she went there and told her that she was taking the dogs to her own ranch and would have no expense there except food, to which plaintiff replied: "You won't have here; I have my own dogs to feed if you will supply the food."

The evidence shows that defendant commenced furnishing dog food in 500 pound lots to plaintiff's ranch and continued this practice until about March, 1944, when plaintiff complained that too much dog food was being stored by her and that it might spoil. On most occasions thereafter money was given plaintiff when defendant was told additional dog food was needed and plaintiff purchased it without any particular accounting to defendant.

About March, 1947, defendant sent plaintiff a telegram informing her that she was taking the dogs to another kennel "unless she wanted them." They were subsequently removed on defendant's orders. It is conceded that over this period of years there existed a mutual understanding regarding any of these dogs or dogs brought to plaintiff's premises by or through defendant, that plaintiff was at liberty to find suitable homes for them and could give them to such new owners. There was evidence that defendant told certain persons about these

dogs and that they could be obtained from plaintiff but that in each case plaintiff refused because she claimed she was not satisfied with the people or the surrounding conditions in the prospective new homes.

There was evidence that in December, 1944, defendant found an orphan fox terrier and asked plaintiff if it would be all right to bring it to her ranch for care. Plaintiff acquiesced and nothing further was said by either party about monetary arrangements for its care. It subsequently had puppies and there is a dispute as to the factual background of their paternal parentage.

Plaintiff testified there were additional mongrel and tramp dogs sent to her by the defendant and that some of them died and others were given away by the plaintiff. Defendant acknowledged that in the summer of 1943, she sent, with plaintiff's consent, several additional stray or orphan dogs to plaintiff's ranch without any additional arrangements as to their care or keep except that she would continue to furnish the supply of dog food for them as she was doing with the other dogs. Two of Dr. White's dogs died in the winter of 1943. The fox terrier and one puppy were given away by plaintiff in 1947.

Sometime in 1943, defendant brought two little lambs to plaintiff, which defendant claimed were being abused. For the board and care of these two lambs and their increase plaintiff claimed $2,916.50. The trial court sustained defendant's claim that defendant had made plaintiff a present of the two lambs at the time and allowed nothing for their care.

About the time of Dr. White's death, an old horse called "Imp" was placed on plaintiff's ranch. There is a dispute in the evidence as to who had it placed there. After that date, with plaintiff's permission, defendant sent two other old horses, which were placed in plaintiff's pasture. In the fall of 1943, Dr. White's horse "Cinto" and defendant's own horse, "Patty" were taken there by defendant. "Cinto" was subsequently killed when it strayed onto the highway. No claim is here made for the care of Patty by the plaintiff. That horse subsequently died. Plaintiff billed defendant for its care and for veterinary services and defendant paid plaintiff $400 for the claimed service. Another old horse was taken to plaintiff's ranch in 1945. One of the horses died in 1945, another in 1946, and another in 1947. One died three months before plaintiff told defendant about it. The ages of the

horses ranged from 20 to 30 years and one was so old its back swayed.

Concerning defendant's arrangement with plaintiff with regard to boarding the horses, we find more vagueness and evasion than with reference to the care of the dogs. Plaintiff did not testify as to any specific arrangements for the horses' care. Defendant, however, testified that in each instance she agreed to furnish such hay as was necessary to supplement plaintiff's pasture. While there was a conflict regarding the grazing and pasturing of horses on plaintiff's ranch, plaintiff admitted that all except "Imp" were loose on a 30-acre place and that her stock was allowed to run on a neighbor's three or four hundred acres and that she supplemented the pasture by feeding hay. The parties are in accord with respect to their practice in buying and paying for hay. In this connection plaintiff would advise defendant that hay was so much per ton and would request money to buy a definite quantity, usually ten tons at a time, and defendant would send the amount of money requested. At the trial, defendant showed that in the furnishing of dog food, hay, wood, fences and money advanced, she accounted for advancements in excess of $6,000 over the period in question and under her arrangements with plaintiff. Plaintiff kept no account of this, but at the trial agreed to a credit in this amount, and the.court allowed it.

As to the reasonable value of the services performed, plaintiff produced a veterinarian who operated a boarding kennel in Riverside. He testified that the standard price for boarding dogs, "since the war" was 75 cents per day to $2.00 per day, depending on the size of the animal; that a collie dog would be $1.00 per day, a police dog $1.50, and a fox terrier 75 cents. On cross-examination he testified that this price included exercising, feeding, general care and keeping the dog groomed at least once a week; that if one kept a number of dogs for a considerable length of time it would be possible that a special rate would be given; that at this price the diet would include meat, prepared dog food, cooked vegetables' and milk. He also testified that in properly operated kennels dogs are not permitted to breed without the owner's authority. In addition to this testimony, plaintiff testified that in boarding kennels in that area, during that period, $1.00 per day was the standard rate for dogs; that Dr. White had previously paid $5.00 per dog per week.

Another witness testified she was paying $5.00 per week per dog for boarding her dogs when she left them at plaintiff's

ranch during her vacation. Plaintiff testified, in her deposition, that she had no license to operate a boarding kennel; that she boarded dogs but was not exactly operating a boarding kennel. She then stated that she had a conscientious objection to the killing of horses and dogs, but this did not apply to sheep; that she filed no claim in Dr. White's estate for the care of the animals; that if Miss Dougan had not contacted her in reference to the dogs "they would still be there" until they died. Defendant testified that the ranch where the remaining dogs are now boarded is charging less than the regular rate because the dogs are orphans.

■ The trial court in its findings did not differentiate between the amount allowed for the care of the dogs and the care of the horses, nor did it therein fix a boarding rate for them. It did not determine the length of time each animal was thus boarded with plaintiff. It merely found that defendant was indebted to plaintiff in the amount of $18,178 (less the credit of $6,000) for caring for five horses and eight dogs. We are therefore unable to determine whether the evidence supports the judgment in reference to the dogs alone.

■ The dogs admittedly were not washed and groomed once a week, if at all, and when not in kennels, were allowed to run over plaintiff's ranch for exercise. The full standard rate of veterinarian boarding kennels, on a short term basis, would not be a fair guide for the reasonable rate to be charged under the circumstances here presented, particularly where defendant furnished the great bulk of the dog food, as here indicated.

As to the horses, plaintiff testified that Dr. White *agreed* to pay $45 per month for the board of Imp. Defendant insists that there were no horses of Dr. White's at plaintiff's ranch at the time of her death; that Imp belonged to Lois Kellogg, and the humane society had been keeping and feeding it; that defendant was going to take it to her ranch and so informed plaintiff; that plaintiff said "Oh! Let me have him; he has been here before and would be at home here"; that she then sent it down to her with a ton of hay; that the arrangement was that plaintiff was to graze it on pasture and defendant was to furnish the hay. The evidence shows that defendant furnished many tons of hay and also furnished additional money for hay when requested to do so by the plaintiff.

Plaintiff testified that the reasonable rate for boarding horses, during the period in question, was $1.50 per day; that this estimate was based upon her inquiry of a near-by boarding stable. She admitted her care of the horses did not include

daily exercise or grooming. She likewise stated the horses were not kept in stalls or barns but were kept in pasture, with the possible exception of "Imp," and hay was made available to them when there was a shortage of pasture. However, she claimed that due to the age of the horses, special care and food were required.

Defendant testified that she was familiar with boarding rates during the period in question; that the prevailing grazing rate was $3.00 per head per month, and for stabled horses $30 per month during winter seasons. It appears from affidavits presented on the motion for new trial that, generally speaking, horses not worked and running in pastures, require no care, and if fed a forkful of hay or two a day, when the pasture is dry, that that is sufficient; that the "going" price per month for such pasturing is from $3.00 to $12; that regular boarding stables charge from $30 to $40 per month, but such charge includes grain and hay two times a day, salt block in a box stall, water several times a day, saddling and unsaddling, grooming, bathing, care of the horse's equipment, blanketing and unblanketing, and that $8.00 per month was the prevailing price for good year-around lush grass pasture.

The uncontradicted evidence in this case shows that the horses here were never furnished such luxurious service, and any judgment based upon a rate of $1.50 per day per horse, during the period of years here in question, would be unreasonable. Just what basis the trial court used in determining that defendant was indebted to the plaintiff in the sum found due is not ascertainable from the findings. ▮ Considering the entire circumstances surrounding the transaction, the judgment allowing $18,178 less a credit of $6,000, for the combined care of the dogs and horses for the period in question, particularly where there was no adequate record kept of the time when such dogs or horses were at plaintiff's ranch, appears to us to be unreasonable and unjust, and not supported by sufficient substantial and convincing evidence, and a new trial should have been granted as to this issue.

In *Citron* v. *Fields*, 30 Cal.App.2d 51 [85 P.2d 534], this court considered a similar question as to the testimony of a doctor in reference to the reasonable value of his services, and reversed the judgment based thereon. (See, also, *Guardianship of Sturges*, 30 Cal.App.2d 477, 497 [86 P.2d 905], where it is said:

"While an appellate tribunal must accept the facts tending to support the judgment as true, yet when the question of their

having sufficient substance to support the plaintiff's case comes in issue, it becomes a question of law alone *as applied to the peculiar facts of the case."*

Since the question of defendant's liability for the care of the animals in question is a close one and since the judgment allowed appears to be unreasonable under the evidence produced, the judgment is reversed as to all issues and they should be reconsidered on a new trial.

Judgment reversed.

Barnard, P. J., and Mussell, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied January 11, 1951.