[No. B008031. Second Dist., Div. One. Sept. 25, 1985.]

ROSEMARY GEBERT et al., Plaintiffs and Respondents, v. ALBERT YANK, Defendant and Appellant.

**COUNSEL**

Rudofsky & Meo, Bernard Grossman and Matthew Meo for Defendant and Appellant.

Butler & Binion and Tom Alexander as Amici Curiae on behalf of Defendant and Appellant.

Kinsella, Boesch, Fujikawa & Towle, Michael C. Denison and Beatriz Olivera Pianko for Plaintiffs and Respondents.

## OPINION

**HANSON (Thaxton), J.**—By amended complaint, plaintiffs Rosemary Gebert and Florence M. Thuillier sought damages from defendant Albert Yank, Worldwide Bloodstock Agency, a California corporation; and Does I through X. Five causes of action were stated concerning two thoroughbred horses the plaintiff-owners had entrusted to defendant Yank: (1) negligence; (2) breach of a bailment contract; (3) breach of an oral contract; (4) negligent misrepresentation; and (5) negligence.[1]

During pretrial discovery, defendant admitted certain facts which established that a bailment had been agreed upon by the parties and had been operative at the time of the actionable events. Trial was by jury. The jury was given general verdict forms which had been modified to allow the jury to indicate the basis for their judgment.[2] The jury awarded plaintiffs $21,100. Upon plaintiffs' motion after the verdict, the trial court awarded interest on this sum from the date of filing the complaint, February 22, 1979, to the date of the verdict, February 24, 1984, for total damages of $29,355.82. After the motion for new trial had been denied, defendant filed a timely notice of appeal.[3]

### FACTUAL BACKGROUND

Plaintiffs Gebert and Thuillier owned two thoroughbred yearling horses, a chestnut filly (sometimes referred to herein as Filly) and a gray colt

---

[1] At trial, the Doe defendants were dismissed. The jury verdict and the judgment were entered against defendant Yank doing business as Worldwide Bloodstock Agency. The fourth and fifth causes of action were also dismissed by plaintiffs.

[2] In pertinent part, the modified verdict read: "We, the jury in the above entitled action, find for the plaintiffs, ROSEMARY GEBERT and FLORENCE THUILLIER and against defendant ALBERT YANK doing business as WORLDWIDE BLOODSTOCK AGENCY and assess damages as follows:

| | | | |
|---|---|---|---|
| For Chestnut Filly | $17,500 | Check | |
| | | on Negligence Theory | |
| | | Bailment Theory | X |
| For Gray Colt | $ 3,600 | | |
| Total | $21,100 | | |

No INTEREST TO BE AWARDED."

[3] California Rules of Court, rule 3(a).

(Colt).[4] Plaintiffs had extensive experience in ranching, and in raising thoroughbred horses for sale. Defendant is what is known as a bloodstock agent, selling thoroughbreds for a commission.

Filly was foaled (born) in May 1977, and was raised at a ranch known as Old English Rancho. In 1978, plaintiffs decided to sell her, and applied to the California Thoroughbred Breeders Association (hereinafter CTBA) for placement of Filly in the select sale at Del Mar, California, a sale sponsored by CTBA and considered one of the best sales in southern California. CTBA verified Filly's pedigree (by sire Windy Sands out of mare Mary Mel) and inspected the animal; she was given a seven rating, on a scale from one to ten, which is well above average, and admitted for the sale to be held in August 1978.

Plaintiff Gebert testified that she valued young Filly at $30,000 and was anxious to command the best price she could get. Acting upon the recommendation of an experienced ranch owner and fellow horse breeder, the plaintiffs decided to employ defendant Yank as their agent for the select sale. Yank was a widely known and respected bloodstock agent, with many years of experience. It was agreed that Filly would be transported to Yank's Swiss Ranch for preparation prior to the sale. On July 15, 1978, Filly was so transported.[5]

On July 23, 1978, Filly was exercised by horse trainer Wally Dunne, an employee of defendant Yank, for about five minutes in a round pen. Dunne then turned over the horse to groom Diane Barnett, also an employee of defendant.

Filly was wearing a halter strapped on her head, with a ring under the chin. The groom held a leather shank, a strap approximately one inch wide and seven feet long; attached to the shank was a thirty-inch chain, which had been passed through the ring of the halter and reattached to itself, forming a loop. Filly had been observed by defendant and by Barnett to be a relatively docile young horse. Barnett led Filly to a patch of grass so that she could graze. Barnett, a former student at Cal Poly San Luis Obispo, had received instruction in handling horses and had recently been employed by defendant as a groom. She testified that she was watching Filly closely, standing on her left side which is the customary position, holding the shank tightly. She denied that the chain with the loop was dragging on the ground. Suddenly, however, Filly "struck out," i.e., raised her left hoof and leg;

---

[4]Thoroughbred horses become yearlings on January 1 after their birth; yearlings are referred to customarily by their color and gender.

[5]The agreement of the parties and the delivery of Filly to the Swiss Ranch and into the care of bailee Yank were not controverted at trial—said facts were admitted by defendant.

her hoof got entangled in the loop of the chain. As is typical of thorough-breds, Filly resisted by pulling backwards, which increased the pressure on the halter on her head. She reared up, fell backward and injured herself. Barnett ran for help, and another employee came to the scene and cut the halter off of Filly's head. However, it was necessary to call a veterinarian and that same day Filly was euthanized, put to sleep.

Plaintiffs were informed of Filly's demise by telephone. Plaintiff Gebert testified that she attempted to reach defendant by telephone for weeks there-after before finally speaking to him about Filly's death. Defendant expressed sorrow and offered to sell another horse of plaintiffs without taking a com-mission. It was agreed that defendant would act as plaintiffs' agent for the sale of a gray colt. Plaintiff Gebert told defendant she would not agree to a sale of Colt for less than $5,000 and defendant understood her intention in this regard; he stated he could get more than that for Colt. Colt was trans-ported to defendant and sold by him on October 31, 1978 at the CTBA fall mixed sale for $1,400. CTBA had not been informed by defendant that there was a minimum price acceptable to the owners of Colt; plaintiffs received a net from the sale of $1,320. This litigation followed.

At trial, the hotly disputed issue was whether the configuration of shank and looped chain around Filly's head and neck constituted thoroughbred horse handling of the negligent variety or met the requisite standard of care. There was sharp disagreement between the witnesses on this point. All seemed to agree that thoroughbred horses are high-strung, nervous, unpre-dictable animals, and that yearlings in particular, being very young horses, have even less capacity for withstanding ordinary distractions. Experienced horse breeder Ruth Betty Rutledge declared that the chain loop was very careless and should have been knotted to ensure the horse's safety. Trainer Leigh Howard, who had given instruction to groom Barnett, testified that Barnett had been properly instructed concerning shanks and chains and had never been told by her to graze an animal with a looped open 30-inch chain. On the other hand, expert Jimmy Mayer testified for the defense that it was customary in the breeding industry to use a 30-inch chain just as it had been utilized by groom Barnett. The last witness for the defense was Johnny Longden, a famous jockey and 77 years old at time of trial, who approved the use of a shank and a 30-inch chain in the manner utilized by Barnett; denied that knots were customarily tied in chains in the horsebreeding in-dustry; he estimated that the odds of a horse putting its hoof through the chain shank were "one in three or four million," but declared that accidents happen to thoroughbreds frequently which cannot be prevented.

Plaintiffs also presented the testimony of Robert A. Sweeny, the executive vice-president and general manager of CTBA, concerning Filly's pedigree

rating by the association and value at the time of her demise. He placed a value of between $15,000 to $20,000 on the animal, with a median of $17,500.

As indicated (see fn. 2, *ante*), the jury rejected plaintiffs' cause of action for negligence but found liability on the part of defendant for breach of the bailment contract regarding Filly, as well as breach of the oral contract regarding Colt.

## ISSUES

Defendant makes no contentions on this appeal regarding Colt. With respect to Filly, defendant contends that (1) the jury was not adequately instructed on the law of bailment; (2) the jury verdict was inconsistent, necessitating reversal; and (3) that the trial court erred in awarding prejudgment interest. Plaintiffs contend that the appeal is frivolous, taken for purposes of delay, and request appropriate sanctions.

## STANDARD OF REVIEW

■ It is a well-established principle of appellate review that "[a] judgment or order of the lower court is *presumed correct.*" (6 Witkin, Cal. Procedure (2d ed. 1971) § 235, p. 4225; italics in text.) However, even taking into account the deference afforded trial courts' determinations, a judgment or verdict which is inherently and logically inconsistent cannot be upheld. (*Brewer* v. *Simpson* (1960) 53 Cal.2d 567, 584 [2 Cal.Rptr. 609, 349 P.2d 289].) As was explained in *Cavallaro* v. *Michelin Tire Corp.* (1979) 96 Cal.App.3d 95, 101 [157 Cal.Rptr. 602], "[t]he inconsistent verdict rule is based upon the fundamental proposition that a factfinder may not make inconsistent determinations of fact based on the same evidence." A defective or inconsistent verdict is therefore subject to reversal on appeal unless the apparent defect or inconsistency may be reasonably reconciled with the ultimate result reached below. (6 Witkin, Cal. Procedure, *supra,* § 321, p. 4300.)

## DISCUSSION

### I.

■ "In a broad sense a bailment is the delivery of a thing to another for some special object or purpose, on a contract, express or implied, to conform to the objects or purposes of the delivery which may be as various as the transactions of men [citation]." (*H.S. Crocker Co., Inc.* v. *McFaddin* (1957) 148 Cal.App.2d 639, 643 [307 P.2d 429]; see also, 9 Cal.Jur.3d

Bailments, p. 114 et seq. and the cases cited, as well as 3 Witkin, Summary of Cal. Law (8th ed. 1973) Personal Property, § 109, p. 1701.)

In our Civil Code, bailments are referred to as deposits (Civ. Code, § 1813 et seq.), but the case law still often employs the common law term, bailment, as well as bailor and bailee. In the instant litigation, the fact of bailment had been established by admissions, and the jury was so instructed.

■ Bailments may be voluntary or involuntary; a bailment for the benefit of both parties, such as the one we consider here, is a bailment for hire, and imposes on the bailee the duty to use ordinary care with respect to the bailed property. (3 Witkin, Summary of Cal. Law, *supra,* § 112, p. 1703.) Breach of the bailment contract may be asserted by the bailor when there is a failure to return that which was bailed.

■ The jury in this case was told that "A bailee, the person who received the property, is not an insurer of the goods left in his possession. That is to say, he is not absolutely responsible if he does not redeliver the goods. He is only responsible if the failure to redeliver is caused by his negligence. When the goods are lost, destroyed or damaged by accident, without any fault on the part of the bailee, the loss must fall on the bailor." This is an accurate statement of California law. (See 3 Witkin, *supra,* § 114, pp. 1705-1706.)

However, the jury was also instructed that once plaintiffs had proved the existence of a bailment, the defendant/bailee had "the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issue: that the loss of Filly occurred without negligence on the part of defendant." This rule is of relatively recent vintage in California. As Witkin explains, "[T]he earlier cases were in conflict on the burden of proof, many placing it upon the bailor. [Citations.] [¶] The former Warehouse Receipts Act placed the burden on the bailee to show freedom from fault, and it was held that the same rule applied to other bailments." (*Ibid.*)

■ The present rule, requiring the bailee to demonstrate lack of fault, was set forth in *Downey* v. *Martin Aircraft Service* (1950) 96 Cal.App.2d 94, 97 [214 P.2d 581], where it was declared that if the burden remains with the bailor, "he will be faced in many cases with insuperable difficulties in securing and presenting evidence." It was concluded that "when a bailee who is under the duty of exercising ordinary care is unable to redeliver the subject of the bailment, it is not enough for him to show that the property was lost, stolen or destroyed, but that if he relies upon such fact to excuse his failure, he must go further and show that the loss occurred without negligence on his part. As heretofore stated, a contrary rule would place

upon the plaintiff [bailor], in many cases, an impossible burden. It is just and fair that one who undertakes for reward to care for a chattel should have the burden of explaining its loss or destruction while in his custody and of negativing an inference of negligence on his part arising from such loss or destruction." (*Id.*, at pp. 99-100.)

And, it was held in *Gardner* v. *Jonathan Club* (1950) 35 Cal.2d 343, 348 [217 P.2d 961], that "If a bailor alleges and proves the deposit of property with the bailee, a demand therefor, and the failure of the bailee to redeliver, the burden of proof rests upon the bailee to explain his failure [citations]." In a more recent case, *Vilner* v. *Crocker National Bank* (1979) 89 Cal.App.3d 732, 737 [152 Cal.Rptr. 850], it was stated that a bailee who fails to redeliver must establish that it is without fault and further, that "[a] simple showing of the exercise of ordinary care is not a sufficient explanation."

■ The burden of proof in a civil case, of course, normally rests with the plaintiff, who has the "obligation . . . to establish by evidence a requisite degree of belief concerning a fact in the mind of the trier of fact or the court." (Evid. Code, § 115.)

The burden of proof placed on a defendant bailee to show freedom from fault is one of the recognized exceptions to this rule. In Witkin, California Evidence (2d ed. 1966) section 198, page 182, it is said that "In exceptional cases reasons of policy, convenience or mere tradition place the burden in a manner different from that which would normally be expected from the requirement of pleading. [Citation.] This is recognized by the proviso in Ev.C. 500—'Except as otherwise provided by law'—and by the Comment: 'In determining whether the normal allocation of the burden of proof should be altered, the courts consider a number of factors: the knowledge of the parties concerning the particular fact, the availability of the evidence to the parties, the most desirable result in terms of public policy in the absence of proof of the particular fact, and the probability of the existence or nonexistence of the fact.' [¶] One of the strongest of these factors is the greater or almost exclusive availability of evidence to the defendant. Thus, a carrier, warehouseman or other bailee, sued for loss or destruction of goods, has the burden of showing his freedom from negligence or other fault. [Citations.]"

■ Defendant, however, complains that the instructions were misleading or not adequate enough, because the jury was not further instructed that once having produced evidence showing lack of fault, defendant had met his burden and that plaintiffs again undertook the obligation to persuade. Defendant essentially relies on a 1914 decision, *Oakland Barge etc. Co.* v.

*Foster* (1914) 25 Cal.App. 193 [143 P. 83]. In *Oakland Barge,* however, it was stated only that defendant's explanation was a subject of conflicting evidence and the lower court's determination would be upheld on appeal. As in *Oakland Barge,* the adequacy of this defendant's explanation was squarely presented to the trier of fact for assessment. While there is some suggestion in the case law that the bailee's explanation need not meet the preponderance standard, the better view is that a bailee must do so. We find no error in the instructions as given.

Defendant also argues that the rules in this regard should be changed, in that special principles should govern bailments for living creatures as opposed to inanimate objects. Defendant claims that there are risks inherent in the care of animals, particularly high-spirited thoroughbred horses like Filly, that justify the development of new law placing the bailees of such property in a more advantageous position; it is contended that the cost of insurance in the thoroughbreeding industry is a factor warranting such consideration.[6]

Defendant asserts that no case dealing with a living chattel could be found, that "[t]here is an absolute void in the law on this subject." Contrary to defendant's assertion, there are numerous California decisions concerning some aspect of the bailment of animals. Some of these cases are *Dennis* v. *Belt* (1866) 30 Cal. 247 (sheep); *Vaughn* v. *Bixby* (1914) 24 Cal.App. 641 [142 P. 100] (horses); *Pacific States Corporation* v. *Gill* (1922) 57 Cal.App. 90 [206 P. 489] (cattle); *Williams* v. *Dougan* (1950) 100 Cal.App.2d 421 [223 P.2d 631] (horses, dogs and lambs).

We decline to develop new rules for bailed animals and note that the issue as such was neither addressed nor litigated below. Civil Code section 1834 provides only that "A depositary of living animals must provide them with suitable food and shelter, and treat them kindly."

It may well be that the rules regarding bailment of living creatures as distinguished from inanimate objects are in need of change. If such reform is required to meet modern conditions, and parties cannot protect themselves by contract, it is within the province of the Legislature. Moreover, the legislative branch of government is better equipped than the judiciary to conduct hearings, to weigh competing interests, study cost/benefit factors, and assess down-the-road impact on all interested parties and institutions concerned.

---

[6]An amicus curiae brief was filed in this court on behalf of the Texas Thoroughbred Breeders' Association, also urging a modification in California law regarding the burden of proof in bailor-bailee cases involving live animals.

## II.

 Defendant claims that the jury verdict as to Filly was inconsistent as a matter of law, compelling reversal. Defendant specifically contends that since the jury rejected plaintiffs' cause of action for negligence, they were precluded from finding, as they did, *for* plaintiffs on the breach of bailment cause of action. As indicated previously, finding for plaintiffs on the breach of bailment cause of action did involve, of necessity, a determination that defendant was, to some degree, negligent in caring for Filly. Defendant, therefore, argues that the jury had to determine that defendant was either negligent or not, and could not make inconsistent determinations with respect to the two causes of action on the same set of facts.

Plaintiffs declare that the verdict was not inconsistent, but reflected that the evidence adduced below on the issue of defendant's negligence was "a tie" and that the jury, properly instructed on burdens of proof, merely followed those instructions, applied different burdens of proof to the evidence, and arrived at a result which was sophisticated rather than confused.

Rarely does a case demonstrate, as this one does, the importance of burdens of proof in terms of the legal consequences. Plaintiffs pleaded two causes of action concerning the loss of Filly, one for negligence and one for breach of bailment. Pleading of alternative theories of relief on the same set of facts is, of course, quite proper and is often done where there is a legally recognized basis for recovery in both contract and tort. (4 Witkin, Cal. Procedure (3d ed. 1985) § 356, p. 411.) The jury was instructed that plaintiffs were proceeding with two alternative theories of recovery, and were instructed as to the elements of each cause of action. They were instructed, as to burdens of proof, that plaintiffs had the burden of proof as to the negligence cause of action but having established the bailment, plaintiffs did not have the burden of proof on negligence in the breach of bailment cause of action. Even aided by the instruction regarding *res ipsa loquitur,* the jury was not sufficiently persuaded of defendant's negligence to find for plaintiffs on the negligence theory, and thus the burden of proof operated to prevent recovery. The jury apparently did regard the evidence on the issue of negligence as very evenly divided, but the burden operated against the defendant on the breach of bailment cause of action because of his failure to completely refute fault on his part.

Given this analysis, it seems clear that burdens of proof may indeed dispose of close factual questions, and we presume that that was the case here. It should also be pointed out that the jury's failure to find negligence does not necessarily equate with the nonexistence of some degree of negligence on the part of defendant; such equation would involve speculation. We can-

not say, under this particular set of circumstances, that the jury verdict was fatally defective due to logical inconsistency. Accordingly, we uphold the verdict in the face of the challenge made.

### III.

 Defendant contends that the trial court erred in awarding prejudgment interest because the jury specifically stated that no interest should be awarded. Defendant's contention is without merit.

Civil Code sections 3287 and 3288 set forth the applicable rules regarding such awards. Civil Code section 3287, subdivision (b), provides that "Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed."

Civil Code section 3288 provides that "In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury."

These sections have been part of the code (with some amendment to section 3287) since 1872, placing certain awards within the province of the jury and others within the discretionary function of the trial court. Prejudgment interest on unliquidated sums have also been upheld by the case law, in the absence of an abuse of discretion. (*Bullis* v. *Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 815 [148 Cal.Rptr. 22, 582 P.2d 109, 7 A.L.R.4th 642]; *Gherman* v. *Colburn* (1977) 72 Cal.App.3d 544, 587 [140 Cal.Rptr. 330]; and *Esgro Central, Inc.* v. *General Ins. Co.* (1971) 20 Cal.App.3d 1054, 1064 [98 Cal.Rptr. 153].)

Plaintiffs were awarded damages for breach of the bailment contract. The jury indicated its desire that no interest be awarded, having been instructed that they could do so if they awarded damages to plaintiffs on the alternative theory of negligence, sounding in tort. We need not speculate on the jury's emphasis that "no interest" was to be awarded, as it is subject to more than one interpretation. The fact is that under Civil Code section 3287, subdivision (b), the trial court has the power to award prejudgment interest when damages have been awarded for breach of contract. As *Bullis* explains, "[p]rejudgment interest is awarded to compensate a party for the loss of the use of his or her property [citation]." The award "will be upheld if it is based on a 'reasoned judgment' . . . ." (*Bullis* v. *Security Pac. Nat.*

*Bank, supra,* 21 Cal.3d at p. 815.) We find no abuse of discretion in the trial court's award of prejudgment damages in the case at bench.

## IV.

 Plaintiffs request the imposition of sanctions on defendant for taking a frivolous appeal for purposes of delay. We have the power to "add to the costs on appeal such damages as may be just" when such a situation is presented. (Code Civ. Proc., § 907; see also, Cal. Rules of Court, rule 26(a).) As our extended discussion of defendant's contentions makes clear, we do not deem the appeal taken as frivolous. Therefore, no sanctions are indicated, and none will be imposed.

### DISPOSITION

The judgment is affirmed.

Spencer, P. J., and Lucas, J., concurred.