Filed 11/24/21  Taylor v. Hankin CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| KRISTA LYNN TAYLOR et al., | B305943 |
| Plaintiffs and Appellants, | Los Angeles County Super. Ct. No. 18STCV03133 |
| v. | |
| LISA HANKIN, | |
| Defendant and Respondent. | |

APPEALS from a judgment and orders of the Superior Court of Los Angeles County, Michael P. Linfield, Judge. Reversed.

Engstrom, Lipscomb & Lack, Walter J. Lack and Brian J. Leinbach for Plaintiffs and Appellants.

Wallace, Brown & Schwartz, George M. Wallace and Lisa J. Brown for Defendant and Respondent.

# INTRODUCTION

Krista Lynn Taylor and Roderick Taylor (Taylors)[1] sued Lisa Hankin for breach of contract, negligence, and breach of bailment after a horse that Hankin leased from the Taylors was permanently injured while in Hankin's care. The trial court granted summary judgment in Hankin's favor after finding all of the Taylors' claims arose out of the underlying lease agreement, which contained no provision, express or implied, contemplating that the horse would be returned to the Taylors in any particular condition. The court awarded Hankin more than $215,000 in attorney fees and costs.

The Taylors appeal from the judgment and subsequent fees and costs awards. Because Hankin did not meet her burden to show no triable issues of fact exist as to any of the Taylors' claims, we reverse the judgment and fees and costs awards entered in her favor.

# FACTS AND PROCEDURAL BACKGROUND

## 1. The Lease Agreement

The Taylors own a show horse named Bravado, who they call Bravo. In late July 2017, the Taylors and Hankin executed a lease agreement (Lease Agreement) through which Hankin agreed to lease Bravo for one year for a single payment of $45,000.

Under the terms of the Lease Agreement, Hankin could use Bravo for "pleasure riding and for showing in the Hunters and Equitation" competition, with restrictions on the number and

---

[1] When referring to the Taylors individually, we use their first names.

type of events in which Hankin could ride Bravo. The agreement also provided that only Hankin, Hankin's trainer, or a rider appointed by Hankin's trainer could ride Bravo.

The Lease Agreement required Hankin to keep Bravo at a specific stable and use the Taylors' farrier to shod the horse. Hankin was solely responsible for most costs related to Bravo's care during the term of the lease, including stabling, veterinary, and any other maintenance costs.

The Lease Agreement also required Hankin to immediately notify the Taylors "of any accident or health problems, injury or unsoundness issues that may arise regarding" Bravo during the term of the lease, "particularly if such accident or health problem reasonably requires veterinary treatment." If Bravo became ill or injured such that he couldn't be used for the purposes outlined in the Lease Agreement, Hankin was required to "continue to care for the horse and remain[ed] financially responsible until such time as the horse [was] returned to the same serviceably sound condition as at [the] start of [the] lease, or at [the] end of [the lease term]."

The Lease Agreement included an integration clause, stating that the terms of the agreement "represent[] the entire Agreement between the parties and may not be amended except in writing."

## 2. Bravo's Injuries

In early July 2018, a few weeks before the end of the Lease Agreement, Maia Aerni, a veterinarian, examined Bravo. Dr. Aerni determined that Bravo was "three out of five lame on the right hind limb on a straight line" and referred the horse to be examined by Carter Judy, a veterinary surgeon.

Around the time Dr. Aerni examined Bravo, Krista visited the stables where Hankin kept the horse. According to Krista, Bravo's "condition was deplorable. He was overheated, covered in flies and exhibited a depressed mood. [¶] … [T]he stall in which Bravo was being kept was filthy. It had not been cleaned and the floor was covered in urine-soaked shavings."

Around late July 2018, Dr. Judy examined Bravo. Dr. Judy determined the horse had "suspensory ligament injury moderate on the right hind," including "moderate to severe chronic active suspensory desmitis with tearing and reactive bone edema at the origin of suspensory." As for the horse's left hind, Dr. Judy found "chronic likely inactive suspensory injury with similar reactive bone edema on the cannon bone."

According to Dr. Judy, Bravo's injuries were "very common" and "typical" in "sport horses." Horses that have previously suffered "some sort" of ligament damage are likely to reactivate the injury in the future. Horses with existing ligament damage can perform normally for months or years before showing signs of lameness. But, in Dr. Judy's opinion, the event that aggravated Bravo's chronic leg injuries likely occurred not long before the horse was examined in early July 2018.

After examining Bravo, Dr. Judy submitted a form veterinarian's report for the Taylors to submit to their insurance company for reimbursement of the horse's veterinarian fees. In the report, Dr. Judy checked a box stating that Bravo's injuries appeared to be "entirely new" and not a recurrence of old injuries. Dr. Judy also stated in his report that he believed Bravo had received "proper care" before and after suffering its injuries, and that the horse's injuries had not been accelerated or caused by "lack of care, neglect, overwork, or improper housing."

When he was later deposed, Dr. Judy testified that when he examined Bravo, he believed the horse's injuries were new because they hadn't been documented before the examination in early July 2018. Dr. Judy also testified that by checking the box that the horse had received proper care and that there was no evidence of neglect or other wrongdoing, he only meant that because the horse had been brought in for examination in early July 2018, he believed it was receiving proper care. He didn't know anything about how the horse was cared for before it was brought in for examination and had "no idea" how the horse suffered the injury that caused lameness in both of its hind legs.

In August 2018, after the Lease Agreement had expired, Dr. Judy performed surgery on both of Bravo's hind legs. According to Krista, Bravo "had to be retired" and could no longer be "ridden, jumped or showed" after the surgery.

### 3.  The Lawsuit

The Taylors filed a lawsuit against Hankin and others,[2] asserting claims for breach of contract, negligence, and breach of bailment. Relevant here, the Taylors claimed Bravo suffered permanent injuries during the term of the Lease Agreement that were negligently caused by Hankin. Specifically, the Taylors claimed Bravo was injured in early 2018. Instead of notifying the Taylors of the horse's injuries, Hankin tried to mask them by having a veterinarian administer various injections that allowed Hankin to continue riding the horse, which exacerbated the horse's injuries. The Taylors also alleged Hankin stabled Bravo in poor conditions, allowed unauthorized people to ride the horse, and used an unauthorized farrier to shod the horse.

---

[2] The other named defendants aren't parties to this appeal.

As for the breach of contract claim, the Taylors alleged it included an implied provision requiring Hankin to return Bravo in "the same physical condition as [the horse] was [in] at the beginning of the Lease [Agreement]." The Taylors alleged Hankin breached the Lease Agreement by: (1) failing to notify the Taylors that Bravo suffered an injury in January 2018; (2) failing to notify the Taylors that Bravo's condition continued to deteriorate after suffering the injury in early 2018; (3) allowing an unauthorized person to ride the horse; (4) allowing an unauthorized farrier to shod the horse; and (5) failing to return the horse at the end of the lease term in the same condition that the horse was in at the beginning of the lease term. For the negligence and breach of bailment claims, the Taylors alleged that Hankin negligently cared for Bravo in such a manner that she permanently injured the horse.

Hankin moved for summary judgment or, in the alternative, summary adjudication of each of the Taylors' claims. Hankin argued that for all of the Taylors' claims, the parties' rights and duties were governed by the Lease Agreement, and since that agreement didn't contain a provision requiring Hankin to return Bravo to the Taylors in any particular condition, the Taylors couldn't prevail on any of their claims at trial. In any event, Hankin argued, all of the Taylors' claims failed on the element of causation because Dr. Judy's testimony established that Bravo's underlying injuries were not caused by any specific act or omission on Hankin's part. Hankin otherwise presented no arguments or evidence addressing the Taylors' various theories of breach of contract, negligence, and breach of bailment. The Taylors opposed Hankin's summary judgment motion.

The court granted summary judgment in Hankin's favor. The court found that each of the Taylors' claims arose from an allegation in the first amended complaint that there "was 'an implied agreement that [Bravo] would be returned in the same physical condition as it was at the beginning of the Lease.' " In the court's view, the parties didn't contemplate an implied term in the Lease Agreement addressing Bravo's health at the end of the lease period because the agreement "specifically provides for the allocation of duties and financial responsibility in the event of an injury or health issues during the term of the lease." The court found the Taylors could not prevail on any of their claims at trial.

The court entered judgment in Hankin's favor. The court later awarded Hankin more than $215,000 in attorney fees and costs.

The Taylors filed separate, timely appeals from the judgment, the order awarding Hankin attorney fees, and the order awarding Hankin costs. We consolidated the Taylors' appeals.

## DISCUSSION

1. **Principles of Summary Judgment and Standard of Review**

A court may grant summary judgment where no triable issues of material fact exist and the moving party is entitled to judgment as a matter of law. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 (*Merrill*).) Defendants who move for summary judgment must show that one or more elements of the plaintiffs' claim cannot be established or that there exists a complete defense to the claim. (Code Civ. Proc., § 437c, subd. (p)(2).) If the defendants make a sufficient showing, the burden shifts to the

7

plaintiffs to present evidence establishing a triable issue of material fact. (*Ibid.*) A triable issue of fact exists if the evidence would allow a reasonable trier of fact to find in favor of the party opposing summary judgment. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).)

We independently review a trial court's ruling on a motion for summary judgment. (*Aguilar*, *supra*, 25 Cal.4th at p. 860.) We liberally construe the evidence in favor of the opposing party and resolve all doubts about the evidence in that party's favor. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142.) We consider all evidence the parties submit in connection with the motion, except that which the court properly excluded. (*Merrill*, *supra*, 26 Cal.4th at p. 476.)

**2.    Triable issues exist as to the element of breach for the Taylors' breach of contract claim.**

We begin by addressing the Taylors' claim for breach of contract, which includes the following elements: (1) the existence of a contract; (2) the plaintiff's performance, or excuse for nonperformance, under the contract; (3) the defendant's breach of a term of the contract; and (4) damages resulting from that breach. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.) The Taylors and Hankin don't dispute the existence of a contract—i.e., the Lease Agreement—or that the Taylors performed under the contract. As we explain below, Hankin failed to meet her burden to show no triable issues exist as to the element of breach of a term of the contract.

In the operative first amended complaint, the Taylors alleged several distinct breaches of the Lease Agreement on Hankin's part that they claim caused or accelerated Bravo's lameness. While one of those claimed breaches was a violation of

an alleged implied term of the Lease Agreement requiring Hankin to return Bravo in the same condition that the horse was in at the beginning of the lease term, the Taylors also alleged Hankin breached the Lease Agreement by: (1) failing to inform them of an injury that Bravo suffered in early 2018, as required by Section 8 of the Lease Agreement; (2) failing to inform them that Bravo's condition continued to deteriorate after suffering the injury in early 2018; (3) allowing an unauthorized minor to ride the horse, as prohibited by Sections 6 and 7 of the Lease Agreement; and (4) allowing a farrier who wasn't approved by the Taylors to shod the horse, as prohibited by Section 4 of the Lease Agreement.

Even if we were to assume Hankin met her burden to establish the Lease Agreement did not include an "implied agreement that [Bravo] would be returned in the same physical condition as [the horse was in] at the beginning of the Lease [Agreement]" regardless of any fault on Hankin's part, Hankin did not meet her initial burden with respect to the other alleged breaches of the Lease Agreement. First, she doesn't dispute that the Lease Agreement includes the other provisions that the Taylors claim she breached—i.e., Section 8 (requiring prompt notification of injury or illness suffered by Bravo and any treatment for that injury or illness); Sections 6 and 7 (prohibiting unauthorized persons from riding Bravo); and Section 4 (requiring the use of the Taylors' farrier to shod the horse).

Second, Hankin presented no arguments or evidence addressing her conduct throughout the term of the Lease Agreement. For instance, Hankin didn't submit any evidence that would foreclose a finding that, while in her care in January 2018, Bravo suffered an injury, which contributed to the horse

becoming lame in early July 2018, and that she failed to comply with the provisions of the Lease Agreement that required her to immediately notify the Taylors of the horse's injury. Nor did Hankin present any evidence addressing the Taylors' allegations that she allowed an unauthorized child to ride the horse and an unauthorized farrier to shod the horse. Hankin, therefore, failed to meet her burden to show no triable issues exist as to these breaches of the Lease Agreement as asserted in the Taylors' first amended complaint.

We also reject the argument that because the Lease Agreement didn't include an implied provision making Hankin a strict liability insurer of Bravo's health, she can't be held liable for *any* injury the horse suffered in her care regardless of whether that injury was caused by her breach of one of the Lease Agreement's terms. Nothing in the Lease Agreement suggests the parties intended to limit, let alone release, Hankin's liability for any injury the horse suffered, regardless of Hankin's fault in causing the injury. (See *Cobb v. Ironwood Country Club* (2015) 233 Cal.App.4th 960, 965–966 [under California law, every contract includes an implied covenant of good faith and fair dealing " ' "to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." ' "].) In fact, the Lease Agreement expressly imposed upon Hankin duties related to maintaining the horse's health and well-being throughout the term of the lease. Specifically, the agreement mandated Hankin immediately notify the Taylors of any injury or illness the horse suffered while in her care, and it required her to undertake and pay for the horse's medical care throughout the term of the Lease Agreement.

10

In short, because Hankin failed to present any evidence or arguments addressing several of her alleged violations of the Lease Agreement, she failed to meet her burden on summary judgment to show no triable issues exist as to the breach of contract claim. (See *Simmons v. Superior Court* (2016) 7 Cal.App.5th 1113, 1124 [defendant moving for summary judgment bears the burden of showing no triable issue of material fact and that she is entitled to judgment as a matter of law].)

3.    **Triable issues exist as to the elements of duty and breach for the Taylors' claims for negligence and breach of bailment.**

We next turn to the Taylors' claims for negligence and breach of bailment. We address the claims together because Hankin offered an identical defense to each of them—i.e., that the Taylors can't pursue a claim for negligence or breach of bailment because the terms of the Lease Agreement supersede any other standard of care Hankin may have owed the Taylors in caring for their horse. Hankin otherwise made no attempt to establish that she didn't owe the Taylors a duty not to injure Bravo while the horse was in her care that arises from a source independent of the terms of the Lease Agreement. As we explain, this tactic is fatal to Hankin's summary judgment motion.

The elements of a negligence cause of action are: (1) a duty that establishes a standard of care; (2) breach of that standard of care; (3) proximate cause; and (4) damages. (*Peredia v. HR Mobile Services, Inc.* (2018) 25 Cal.App.5th 680, 687.)

A claim for breach of bailment operates similarly to a claim for negligence. "A bailment is generally defined as 'the delivery of a thing to another for some special object or purpose … .'

11

[Citations.]" (*Windeler v. Scheers Jewelers* (1970) 8 Cal.App.3d 844, 850.) Where a bailment for the parties' mutual benefit exists,[3] the bailee is held to a standard of ordinary care in maintaining the bailor's property, unless the parties otherwise agree to limit the bailee's liability. (*Haidinger-Hayes, Inc. v. Marvin Hime & Co.* (1962) 206 Cal.App.2d 46, 50; see Civ. Code, § 1852 ["A depositary for hire must use at least ordinary care for the preservation of the thing deposited."].) While not an insurer of the property, the bailee may be held liable for any loss or injury to the property caused by her breach of that standard of care. (*Gebert v. Yank* (1985) 172 Cal.App.3d 544, 551.)

Thus, unlike a claim for breach of contract, claims for negligence and breach of bailment generally arise out of the defendant's breach of a standard of care established by law, not the breach of a term of a contract between the parties. In other words, the defendant's liability for a claim of negligence or breach of bailment arises out of a source independent of an agreement between the parties, unless the parties specifically agree to limit the defendant's liability.

Here, Hankin points to nothing in the Lease Agreement or any other evidence that suggests the parties intended to limit her liability or release her from liability for any injury to Bravo that she negligently caused. Indeed, as we discussed above, while the Lease Agreement may not have made Hankin an insurer of the horse's health, it clearly imposed upon her several duties related to the horse's care and well-being, such as requiring her to immediately notify the Taylors of any illness or injury suffered by

---

[3] Hankin concedes the parties entered into a bailment for their mutual benefit.

12

Bravo while in her care and to provide and pay for medical care for the horse throughout the term of the lease. Thus, contrary to Hankin's and the court's view, the Lease Agreement imposed a duty upon Hankin to ensure Bravo's health, safety, and well-being during the term of the lease. In other words, the agreement did not lower or eliminate any duty of care on Hankin's part concerning Bravo's health for purposes of a negligence or a breach of bailment claim.

Hankin also contends the Taylors' claims for negligence and breach of bailment are duplicative legal theories of the breach of contract claim and, consequently, are barred simply because all three claims arise out of the same injury. We disagree. While all three claims stem from Bravo's alleged loss of utility and value, that only means the Taylors may be precluded from recovering additional damages for the same injury caused by Hankin's actionable conduct. (See *Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590, 1612 [" 'Regardless of the nature or number of legal theories advanced by the plaintiff, he is not entitled to more than a single recovery for each distinct item of compensable damages supported by the evidence.' "].) But that doesn't mean the Taylors can't advance alternative legal theories—i.e., breach of contract, negligence, and breach of bailment—to recover the loss of value stemming from Bravo's injuries, which is exactly what the Taylors have done in this case. (See *ibid.* [while an injury gives rise to one primary right or a single "cause of action," a plaintiff may allege multiple legal theories of recovery for the violation of that right].)

What this means is Hankin was required to specifically establish no triable issues exist as to at least one of the elements of each of the Taylors' claims for breach of bailment and

negligence or that a complete defense precluded those claims. But, like she did with respect to the Taylors' breach of contract claim, Hankin offered no evidence or arguments addressing her conduct while Bravo was in her care. Specifically, Hankin presented no evidence to disprove the Taylors' allegations that she negligently cared for Bravo, such as by continuing to ride him after he was injured in early 2018 or by stabling him in poor conditions. Hankin, therefore, failed to satisfy her burden to show no triable issues exist as to whether she breached the standard of care applicable to the Taylors' breach of bailment and negligence claims.[4]

---

[4] Hankin objected to much of the evidence that the Taylors submitted in support of their allegations that Hankin breached various terms of the Lease Agreement and the standards of care applicable to their negligence and breach of bailment claims. Hankin asks us to rule on those objections even though the trial court didn't address them when it ruled on her summary judgment motion. (See Code Civ. Proc., § 437c, subd. (q) ["In granting or denying a motion for summary judgment or summary adjudication, the court need rule only on those objections to evidence that it deems material to its disposition of the motion. Objections to evidence that are not ruled on for purposes of the motion shall be preserved for appellate review."].)

We need not address Hankin's objections because she has not met her initial burden on summary judgment to show no triable issues exist as to whether she breached the Lease Agreement or the standards of care giving rise to the Taylors' negligence and breach of bailment claims. Accordingly, the burden never shifted to the Taylors to present evidence that would create a triable issue of fact on the issue of breach. (Code Civ. Proc., § 437c, subd. (p)(2).) In other words, Hankin was not entitled to summary judgment regardless of the adequacy of the Taylors' opposition.

## 4. Triable issues exist as to the element of causation for each of the Taylors' claims.

Hankin doesn't dispute that the same causation analysis applies to each of the Taylors' claims.[5] As we explain, Hankin didn't meet her burden to show no triable issues exist as to whether her alleged breaches of the Lease Agreement and the standards of care applicable to the Taylors' negligence and breach of bailment claims proximately caused Bravo's injuries.

The issue of causation is ordinarily a question of fact for the jury to decide. (*Raven H. v. Gamette* (2007) 157 Cal.App.4th 1017, 1029.) Where the extent or cause of the underlying injury requires a professional medical opinion, causation must be proven through competent expert testimony. (*Bromme v. Pavitt* (1992) 5 Cal.App.4th 1487, 1498.) As the party moving for summary judgment, Hankin was required to present declarations or other evidence of competent expert testimony to negate the element of causation. (See *Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 123 [in a case where expert medical testimony is required to prove causation, the party moving for summary

---

[5] Hankin takes issue with the Taylors' argument that for the breach of bailment claim, Hankin would carry the burden *at trial* to prove Bravo's injury was not caused by Hankin's negligence. This issue is not relevant to this appeal since we are concerned only with whether Hankin met her initial burden of persuasion *on summary judgment*. It is well-settled that the initial burden of persuasion on summary judgment lies with the moving party, not the plaintiffs opposing summary judgment. (*Doe v. Good Samaritan Hospital* (2018) 23 Cal.App.5th 653, 661 (*Good Samaritan Hospital*) ["A defendant moving for summary judgment must show that one or more elements of the plaintiff's cause of action cannot be established or show there is a complete defense to the plaintiff's cause of action."]).

judgment bears the initial burden to present such testimony on that issue].)

Hankin relies solely on Dr. Judy's testimony and post-surgery report in support of her contention that she satisfied her burden to show no triable issues exist as to whether she caused or contributed to Bravo's injuries. Hankin asserts that Dr. Judy's deposition testimony that the type of injuries Bravo suffered were "very common" in show horses establishes the horse's lameness was caused by routine use, not by any breach of the Lease Agreement or negligent conduct on her part. We disagree. The doctor's testimony does not explain *how* the particular injuries that Bravo suffered were caused. The fact that a class of horses commonly suffers a specific injury, by itself, doesn't mean that each instance of a horse suffering such an injury could not have been caused by someone's conduct. Nor does the doctor's testimony conclusively establish that, even if the initial injury was caused by routine use, the exacerbation of the injury wasn't caused by Hankin's alleged negligence or violations of the Lease Agreement's requirements.

Dr. Judy's post-surgery report also doesn't negate causation. In that report, the doctor checked boxes on a form stating that (1) Bravo had received "proper care" before and after suffering its injuries and (2) that the horse's injuries had not been accelerated or caused by "lack of care, neglect, overwork, or improper housing." But Hankin ignores the fact that, in his subsequent deposition testimony, Dr. Judy clarified what he meant when he checked those boxes. Dr. Judy explained that he checked the boxes only because Hankin and the Taylors brought Bravo to a veterinarian for the examination in early July 2018 during which Dr. Aerni discovered the horse's two hind legs were

16

lame. And while Dr. Judy testified that he "had no evidence" that someone did anything neglectful, that is not the same as him testifying that Hankin didn't negligently cause Bravo's injury. Indeed, and most importantly, Dr. Judy testified that he had "no idea" what "event occurred that caused the horse" to become injured. (See *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135 [value of expert's opinion depends not on the expert's conclusion but on what evidence and factors that conclusion was based].)

In fact, Dr. Judy's testimony arguably *creates* a triable issue concerning causation. As we noted in our summary of the facts, Dr. Judy testified that, based on the nature of Bravo's injuries, the event that aggravated them and caused the horse's lameness likely occurred "relatively recent" in relation to Dr. Aerni's examination in July 2018. That testimony supports, and doesn't negate, a finding that the event or conduct that caused Bravo's injuries leading to the Taylors' lawsuit occurred while Hankin was caring for the horse.

Since Hankin presented no other evidence that explains how Bravo suffered the injuries giving rise to this lawsuit or that establishes the horse wasn't injured by any breach of the Lease Agreement's terms or negligent conduct on her part, she has not satisfied her burden on summary judgment to negate the element of causation as to any of the Taylors' claims.

## 5. Conclusion

In sum, the court erred in granting Hankin's summary judgment motion because Hankin failed to show one or more elements of any of the Taylors' claims cannot be established or that a complete defense precludes any of the Taylors' claims. (*Good Samaritan Hospital*, *supra*, 23 Cal.App.5th at p. 661.)

Because we reverse the judgment, we must also reverse the court's orders awarding attorney fees and costs to Hankin as the prevailing party in this case.

## DISPOSITION

The judgment and orders awarding attorney fees and costs are reversed. The Taylors shall recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

EGERTON, J.