APPENDIX 2

Marwan ABOULHOSN, Plaintiff,

v.

MERRILL LYNCH, PIERCE, FEN-
NER & SMITH INCORPORATED;
Roe business organizations I–X, and
Doe individuals I–X, Defendants.

Case No. CV 12–00891 MMM (SPx).

United States District Court,
C.D. California.

April 16, 2013.

Anthony Albert Liberatore, A. Liberatore Law Offices, Los Angeles, CA, for Plaintiff.

Patricia S. Riordan, Edwards Wildman Palmer LLP, Los Angeles, CA, for Defendants.

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S COMPLAINT; MOTION FOR SUMMARY JUDGMENT ON CROSS-COMPLAINT

MARGARET M. MORROW, District Judge.

On February 1, 2012, Marwan Aboulhosn filed this action against Merrill Lynch Pierce Fenner and Smith, Inc. ("Merrill Lynch") and certain fictitious defendants.[1]

---

1. Complaint, Docket No. 1 (Feb. 1, 2012).

On April 12, 2012, Merrill Lynch filed a counterclaim against Aboulhosn.[2] On December 17, 2012, Merrill Lynch filed a motion for summary judgment on its counterclaim,[3] and a motion for summary judgment on the claims asserted in Aboulhosn's complaint.[4] Aboulhosn opposes both motions.[5]

## I. FACTUAL BACKGROUND

### A. Aboulhosn's Employment and the Promissory Note

Aboulhosn commenced employment with Bank of America Investment Services, Inc. ("BAI") on August 6, 2007.[6] On February 10, 2009, Aboulhosn and BAI executed a payment agreement ("the Agreement")[7] that, subject to the provisions of the Agreement, obligated BAI to make six annual payments of $91,735.83 to Aboulhosn as consideration for his continued services.[8] Aboulhosn contends that the payments under the Agreement represented a bonus BAI had agreed to pay if he suc-

cessfully maintained and/or increased the assets he was managing.[9]

On the same day that the parties executed the Agreement, they also executed a promissory note ("the Note") that obligated Aboulhosn to pay BAI six annual payments of $91,735.83 in consideration for a $550,415 loan ("the Loan").[10] Aboulhosn agreed that the Note would become "immediately due and payable, without notice or demand, if [his] employment with BAI [was] voluntarily or involuntarily suspended or terminated." [11] The Note provided that interest on the loan would accrue at the rate of 5% per annum.[12] Aboulhosn also agreed to reimburse Merrill Lynch for any and all damages, losses, costs and expenses, including attorneys' fees, incurred by it due to a breach of the note.[13] Aboulhosn asserts that the Note secured the bonus to be paid under the Agreement; he contends that, on an annual basis, he was to make an installment payment under the Note, at which point, BAI was to pay that amount to him less taxes and deductions under the Agreement.[14] He contends

**2.** Counterclaim, Docket No. 10 (Apr. 12, 2012).

**3.** Motion for Summary Judgment as to Its Counterclaim, Docket No. 28 (Dec. 17, 2012) ("Counterclaim MSJ").

**4.** Motion for Summary Judgment as to the Claims in Plaintiff's Complaint ("MSJ"), Docket No. 29 (Dec. 17, 2012).

**5.** Opposition to Motion for Summary Judgment as to the Claims in Plaintiff's Complaint ("Opp."), Docket No. 39 (Feb. 4, 2013); Opposition to Motion for Summary Judgment as to Its Counterclaim ("Counterclaim Opp."), Docket No. 42 (Feb. 5, 2013)

**6.** Statement of Uncontroverted Facts and Conclusions of Law in Support of Defendant's Motion for Summary Judgment on the Claims in Plaintiff's Complaint ("UF"), Docket No. 29–1 (Dec. 17, 2012), ¶ 1; Supplemental Separate Statement ("SS"), Docket No. 41–2 (Feb. 5, 2013), ¶ 1.

**7.** UF, ¶ 9; SS, ¶ 9.

**8.** *Id.*; Cross–Defendant Marwan Aboulhosn's Declaration in Support of the Opposition to Defendant's Motion for Summary Judgment ("Aboulhosn Decl."), Docket No. 42–1 (Feb. 5, 2013), ¶ 6.

**9.** Aboulhosn Decl., ¶ 4.

**10.** Statement of Uncontroverted Facts and Conclusions of Law In Support of Defendant's Motion for Summary Judgment on its Counterclaim ("Counterclaim UF"), Docket No. 28–1 (Dec. 17, 2012), ¶ 2; Supplement Separate Statement ("Counterclaim SS"), Docket No. 42–2 (Feb. 5, 2013), ¶ 2.

**11.** Counterclaim UF, ¶ 6; Counterclaim SS, ¶ 6.

**12.** Counterclaim UF, ¶ 3; Counterclaim SS, ¶ 3.

**13.** Counterclaim UF, ¶ 7; Counterclaim SS, ¶ 7.

**14.** Aboulhosn Decl., ¶ 6.

that this pair of transactions was completed once before he was terminated.[15]

In addition to the Note, Aboulhosn read and signed an "Important Acknowledgment Form" ("the Form").[16] In the Form, Aboulhosn acknowledged that the loan was not a bonus, and that if his employment was terminated for any reason, all outstanding principal and interest under the Note would become immediately due and payable.[17]

The Agreement states, in relevant part: "Employee understands that Employee is employed on an at-will basis. This agreement does not constitute an agreement by [BAI] to employ Employee for a specified period of time, and employee's employment may be terminated at any time, with or without notice or cause." [18] The Note states: "This agreement does not constitute an agreement [by BAI] to employ Employee for a specified period of time, and Employee's employment may be terminated at any time, with or without notice or cause." [19] Aboulhosn read and understood the Note before he voluntarily signed it.[20] Thus, as of February 10, 2009, Aboulhosn understood that he was an at-will employee, and that Merrill Lynch could terminate him at any time with or without cause.[21]

On October 26, 2009, BAI merged with Merrill Lynch.[22] Merrill Lynch thus became the holder and owner of the Note.[23]

BAI paid $550,415 to Aboulhosn pursuant to the Note on or about February 17, 2009.[24] Aboulhosn made only one payment on the Note—a $91,735.84 payment on February 9, 2010.[25] Merrill Lynch forgave the interest due on the Note through that date.[26] As of July 1, 2010, the remaining principal balance on the Loan was $458,679.16.[27]

When Aboulhosn commenced his employment with Merrill Lynch, his manager told him the Associate Handbook ("the Handbook") was available and accessible to him online.[28] The Handbook states:

"The provisions of the Associate Handbook do not establish enforceable employee rights, contractual or otherwise, and they do not establish an employment relationship enforceable by associates. The provisions are not promises; they are subject to change at any time without notice and are subject to management's discretion in their application. [Nothing] in this handbook or any other Bank publication, policy or guideline shall interfere with or limit in any way the right of the company to terminate any associate's employment without

**15.** *Id.*

**16.** Counterclaim UF, ¶ 9; Counterclaim SS, ¶ 9.

**17.** Counterclaim UF, ¶ 11; Counterclaim SS, ¶ 11.

**18.** UF ¶ 10; SS, ¶ 10.

**19.** UF, ¶ 5; SS, ¶ 5.

**20.** UF, ¶¶ 7–8; SS, ¶¶ 7–8.

**21.** UF, ¶ 6; SS, ¶ 6; *id.*, ¶ 11; UF, ¶ 11.

**22.** Counterclaim UF, ¶ 13; Counterclaim SS, ¶ 13.

**23.** Counterclaim UF, ¶ 14; Counterclaim SS, ¶ 14.

**24.** Counterclaim UF, ¶ 2; Counterclaim SS, ¶ 2.

**25.** Counterclaim UF, ¶ 15; Counterclaim SS, ¶ 15.

**26.** *Id.*

**27.** Counterclaim UF, ¶ 21; Counterclaim SS, ¶ 21.

**28.** UF, ¶¶ 2–3; SS, ¶¶ 2–3.

cause or notice at any time, or confer upon any associate any right to change an associate's existing at-will employee status. Associates remain employed at-will and the at-will employment relationship can only be changed by an authorized company representative in writing." [29]

### B. Merrill Lynch's Family Care Leave Policy

Merrill Lynch's family care leave policy permits an employee to take up to 26 weeks of unpaid leave from work to care for the serious health condition of a family member.[30] Employees on family care leave can also receive job-protected Family Medical Leave Act ("FMLA") leave for up to 12 work weeks in a rolling twelve-month period.[31] If a family care leave qualifies for FMLA protection, the FMLA and family care leave periods run concurrently.[32]

The 2010 Handbook contains Merrill Lynch's medical leave policy, including its family care leave policy policy and FMLA policy.[33] As noted, Aboulhosn knew throughout the course of his employment at Merrill Lynch that he could access the Handbook online.[34]

The Handbook directs employees to contact Aetna, Merrill Lynch's leave adminis-trator, to initiate a family care leave.[35] It also provides Aetna's phone number.[36] The Handbook states: "Once the leave has been initiated, the required health care provider certification and request forms must be completed and returned to the Leave Administrator within 15 days. Failure ... to complete the required documentation in a timely fashion could result in a denial of the leave request." [37]

### C. Aboulhosn's 2010 Leave

In early May 2010, Aboulhosn informed his manager, Deanna Norris, that he had to take a leave to care for his father in Lebanon.[38] Norris told Aboulhosn that he had two options: family care leave or personal leave.[39] She advised Aboulhosn that he would have to submit documentation from his father's doctor to demonstrate that he qualified for family care leave.[40] Aboulhosn thus understood in early May 2010 that if he took family care leave, he would have to submit documentation to support the leave.[41] Aboulhosn's managers encouraged him to take family medical leave,[42] and he ultimately chose that option.[43]

Aboulhosn called Aetna to initiate his leave on May 21, 2010.[44] Aetna told Aboulhosn: he would have to submit documents before his leave could be approved,[45]

---

29. UF, ¶ 15; SS, ¶ 15.

30. UF, ¶ 19; SS, ¶ 19.

31. *Id.*

32. See Declaration of Katherine M. Anderson in Support of Motion for Summary Judgment on the Claims in Plaintiff's Complaint("Anderson Decl."), Docket No. 29–4 (Dec. 17, 2012), Exh. A at 10.

33. UF, ¶ 14; SS, ¶ 14.

34. UF, ¶ 3; SS, ¶ 3.

35. UF, ¶ 16; SS, ¶ 16; Anderson Decl. Exh. A at 156.

36. *Id.*

37. UF, ¶ 17; SS, ¶ 17; Anderson Decl., Exh. A, at 156.

38. UF, ¶ 20; SS, ¶ 20.

39. UF, ¶ 21; SS, ¶ 21.

40. UF, ¶ 22; SS, ¶ 22.

41. UF, ¶ 23; SS, ¶ 23.

42. *Id.*

43. UF, ¶ 25; SS, ¶ 25.

44. UF, ¶ 29; SS, ¶ 29.

45. UF, ¶ 30; SS, ¶ 30.

and said it would send him the documents he needed to submit for approval.[46] Aetna also gave Aboulhosn a facsimile number to which he could fax the documents supporting his leave request.[47] Aboulhosn instructed Aetna to send mail to his home address until he left for Lebanon.[48]

While Aboulhosn was in Lebanon, he had his mail forwarded from his house to his brother's house.[49] Aboulhosn called Aetna from Lebanon and instructed it to send communications to him to his brother's address.[50]

Merrill Lynch asserts that Aetna sent Aboulhosn a letter on May 24, 2010, which enclosed a document that detailed his rights under the Family Medical Leave Act of 1993, an Authorization for the Release of Medical Information, and a Fair Employment and Housing Commission Certification of Health Care Provider.[51] The letter purportedly stated that Aboulhosn was required to provide a completed Health Care Provider Certification by June 8, 2010, and warned that his absence would not be approved until Aetna made a final determination concerning his request.[52] Aboulhosn contends he never received the letter and attachments, and disputes that they were sent.[53]

Merrill Lynch asserts that Aetna sent Aboulhosn a second letter on May 28, 2010, reminding him to complete the documentation required for his leave request.[54] Aboulhosn contends he never saw the letter, and disputes that it was sent.[55] Merrill Lynch also asserts that on June 14, 2010, Aetna sent Aboulhosn a letter stating that his leave request had been denied because he had failed to complete the required documentation.[56] Aboulhosn disputes that the letter was sent or received by him.[57]

On June 14, 2010, Lori Morales, the assistant to Aboulhosn's manager, sent Aboulhosn an email forwarding a notice from Aetna that his leave had been denied for failure to complete the required documentation.[58] The email advised Aboulhosn to call Aetna directly.[59] It stated:

> "Aetna makes three calls to the associate and then forwards an email to the manager as the final notice. To date, they have made the first phone call to you and are looking to discuss the status of your leave request. You may still be able to submit medical documentation at this point, but must contact Aetna ASAP as the window is very short." [60]

On June 17, 2010, Aboulhosn's manager, Jeffrey Smith, emailed him.[61] Smith's email stated that he had unsuccessfully attempted to reach Aboulhosn twice by telephone.[62] It also stated that Aboulhosn's assistance was needed because his leave

46. UF, ¶ 31; SS, ¶ 31.

47. UF, ¶ 32; SS, ¶ 32.

48. UF, ¶ 33; SS, ¶ 33.

49. UF, ¶ 34; SS, ¶ 34.

50. UF, ¶ 35; SS, ¶ 35.

51. UF, ¶ 36; SS, ¶ 36.

52. UF, ¶ 37; SS, ¶ 37.

53. UF, ¶ 36; SS, ¶ 36.

54. UF, ¶ 39; SS, ¶ 39.

55. *Id.*

56. UF, ¶ 41; SS, ¶ 41.

57. *Id.*

58. UF, ¶ 44; SS, ¶ 44.

59. UF, ¶ 45; SS, ¶ 45.

60. UF, ¶ 46; SS, ¶ 46.

61. UF, ¶ 48; SS, ¶ 48.

62. UF, ¶ 49; SS, ¶ 49.

had been denied for failure to provide the necessary documents to Aetna's leave manager.[63] The email attached Aetna's paperwork.[64]

Aboulhosn received Smith's email,[65] and responded on June 18, 2010. He noted that he had told Aetna to send any communications to his brother's address and that his brother had advised that he had not received anything.[66] Aboulhosn asked that Aetna resend the forms to his brother.[67] He also stated that he could print and complete the forms Smith had forwarded to him by email, and that he anticipated returning to work in November 2010.[68]

Smith sent a reply email the same day, confirming that the forms he had emailed to Aboulhosn were those Aetna provided.[69] Smith advised Aboulhosn both to call Aetna and return the forms to it.[70] It is undisputed that Aboulhosn received this email.[71]

Also on June 18, 2010, another Merrill Lynch financial advisor, Jon Andracek, sent Aboulhosn an email, with a header in bold type and large font that said "Leave of Absence Important."[72] The email stated that Morales had asked Andracek to reach out to Aboulhosn to let him know that it was extremely important for him to contact Aetna regarding his leave.[73] It is undisputed that Aboulhosn received this email.[74]

On June 21, 2010, Aboulhosn's manager sent an email notifying him that Aetna had not received the documentation required to approve his leave.[75] The email attached an "Absent From Work Without Leave" notice ("the Notice"),[76] which stated that BAI would assume that Aboulhosn had voluntarily resigned if he failed to submit medical documentation to Aetna supporting his absence from work and return to the workplace by June 27, 2010. In this event, the notice advised, Aboulhosn would be terminated as of June 28, 2010 and be ineligible for rehire.[77] It is undisputed that Aboulhosn received, read, and understood the Notice.

On June 21, 2010, Aboulhosn asked Aetna to fax a copy of the certification form to a friend.[78] Aetna did so and the friend forwarded it to Aboulhosn the same day.[79] Smith also emailed Aboulhosn a copy of the certification form that day.[80]

On June 22, 2010, Aboulhosn completed, signed, and dated the certification form.[81] He attempted to fax the certification to Aetna on June 23, 2010 from his home fax in Lebanon, but received no confirmation that the fax had been successfully sent.[82] On June 24, 2010, Aboulhosn called Aetna

63. *Id.*

64. *Id.*

65. UF, ¶ 50; SS, ¶ 50.

66. UF, ¶ 51; SS, ¶ 51.

67. *Id.*

68. UF, ¶ 52; SS, ¶ 52.

69. UF, ¶ 53; SS, ¶ 53.

70. *Id.*

71. UF, ¶ 54; SS, ¶ 54.

72. UF, ¶ 55; SS, ¶ 55.

73. UF, ¶ 56; SS, ¶ 56.

74. UF, ¶ 57; SS, ¶ 57.

75. UF, ¶ 58; SS, ¶ 58.

76. *Id.*

77. UF, ¶ 60; SS, ¶ 60.

78. UF, ¶ 63; SS, ¶ 63.

79. *Id.*

80. UF, ¶ 64; SS, ¶ 64.

81. UF, ¶ 75; SS, ¶ 75.

82. UF, ¶ 84; SS, ¶ 84.

to see if it had received the fax; Aetna could not confirm that it had.[83]

Aboulhosn attempted to fax the certification to Aetna again on June 24, 2010, from a fax machine at a store.[84] Aboulhosn asserts that he received confirmation the fax had gone through on a computer screen at the store, and that a store employee informed him the fax had been successfully sent.[85] It is undisputed, however, that Aboulhosn did not receive a printed confirmation page indicating the fax had been successfully sent.[86] Aboulhosn also did not call Aetna to confirm that it had received the second fax.[87]

On June 28, 2010, Smith sent Aboulhosn an email stating that Aetna was not able to confirm that he had submitted the required paperwork to support his leave.[88] The email asked if Aboulhosn had spoken to Aetna, and, if so, the date and time of the call and the name of the case manager with whom he spoke.[89]

On June 29, 2010, Smith sent Aboulhosn an email with a header in bold type and large font that said "Leave Denial—Urgent."[90] The email stated that Aetna still had Aboulhosn's leave request in "denied" status; that it had confirmed to Smith that it faxed the certification form to Aboulhosn on June 21, 2010; that Smith had emailed

the certification to Aboulhosn the same day; and that Smith was being asked to terminate Aboulhosn's employment due to job abandonment.[91] Smith asked Aboulhosn if he had submitted the required information to Aetna, and if so, to provide the details of how he did so.[92] Aboulhosn received this email.[93]

On July 1, 2010, Merrill Lynch terminated Aboulhosn's employment.[94] Aboulhosn's manager told him he was being terminated for job abandonment.[95]

On July 30, 2010, Aboulhosn successfully faxed the certification to Aetna, as documented by a fax confirmation sheet.[96] The certification stated that Aboulhosn needed six months of leave to provide home care and transportation for his father.[97] It stated that Aboulhosn's father needed to have his blood pressure monitored, and that he needed to be given medication.[98] It did not state when Aboulhosn's father's condition commenced.[99] It also left blank the period of time during which Aboulhosn's father had been under a doctor's care for the condition.[100] The certification noted that Aboulhosn's father had not been admitted over night to the hospital for medical care,[101] and stated that the condition did not cause periodic flare-ups that prevented the father from participat-

83. UF, ¶ 85; SS, ¶ 85.

84. UF, ¶ 86; SS, ¶ 86.

85. Id.

86. Id.

87. UF, ¶ 87; SS, ¶ 87.

88. UF, ¶ 65; SS, ¶ 65.

89. Id.

90. UF, ¶ 66; SS, ¶ 66.

91. UF, ¶ 67; SS, ¶ 67.

92. Id.

93. UF, ¶ 68; SS, ¶ 68.

94. UF, ¶ 105; SS, ¶ 105.

95. UF, ¶ 106; SS, ¶ 106.

96. UF, ¶¶ 89–90; SS, ¶¶ 89–90.

97. UF, ¶ 74; SS, ¶ 74.

98. UF, ¶ 80; SS, ¶ 80.

99. UF, ¶ 76; SS, ¶ 76.

100. UF, ¶ 79 SS, ¶ 79.

101. UF, ¶ 77; SS, ¶ 77.

ing in normal daily activities.[102] Aboulhosn handwrote the information on the health care provider portion of the form because the doctor's handwriting was difficult to read.[103] That portion of the certification is dated June 23, 2010 and stamped with arabic letters on the signature line.[104]

Aboulhosn's father has had high blood pressure since 2006.[105] Aboulhosn asserts that his father required open heart surgery in 2006 to address his high blood pressure.[106] While in Lebanon, Aboulhosn cared for his father by being present when he took his medication, ate, and exercised.[107] Aboulhosn did not have to transport his father to doctor appointments; his father walked to them.[108] On October 29, 2010, Aboulhosn returned to the United States from Lebanon.[109]

## II. DISCUSSION

### A. Standard Governing Motions for Summary Judgment

A motion for summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R.CIV.PROC. 56. A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof on an issue at trial, the

movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. See *id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); FED.R.CIV.PROC. 56(e)(2). Evidence presented by the parties at the summary judgment stage must be admissible. FED.R.CIV.PROC. 56(e)(1). In reviewing the record, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987).

### B. Aboulhosn's FMLA Interference Claim

■ The Family Medical Leave Act ("FMLA") "creates two interrelated, substantive employee rights: first, the employee has a right to use a certain amount of leave for protected reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave." *Bachelder v. Am. W. Airlines, Inc.,* 259 F.3d 1112, 1122 (9th Cir.2001). It is "unlawful for any employer to interfere with, restrain, or deny the

---

102. UF, ¶ 81; SS, ¶ 81.

103. UF, ¶ 83; SS, ¶ 83.

104. UF, ¶ 82; SS, ¶ 82.

105. UF, ¶ 69; SS, ¶ 69.

106. UF, ¶ 71; SS, ¶ 71.

107. UF, ¶ 99; SS, ¶ 99.

108. UF, ¶ 98; SS, ¶ 98.

109. UF, ¶ 104; SS, ¶ 104.

exercise of or the attempt to exercise" these rights. 29 U.S.C. § 2615(a)(1); see also *Sanders v. City of Newport,* 657 F.3d 772, 778 (9th Cir.2011).

■ To prevail on a FMLA claim based on alleged interference with the right to take leave, the employee must prove that: "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Bachelder,* 259 F.3d at 1124; *Golez v. Potter,* No. 09cv0965 AJB, 2012 WL 3134256, *2 (S.D.Cal. July 31, 2012); *Houston v. Regents of Univ. of Cal.,* No. C 04–4443 PJH, 2006 WL 1141238, *33 (N.D.Cal. May 1, 2006). Merrill Lynch does not dispute that Aboulhosn was eligible for FMLA protection; that it is an FMLA-covered employer; and that Aboulhosn provided sufficient notice of his intent to take leave. It argues, however, that Aboulhosn cannot establish the third and fifth elements of an FMLA claim.

Merrill Lynch contends Aboulhosn's FMLA claim fails as a matter of law because he was not entitled to take FMLA leave. It asserts that (1) he failed to submit the required medical documentation supporting his leave request in a timely fashion; (2) the FMLA does not contemplate leave protection for the kind of care Aboulhosn was providing to his father, who did not suffer from a "serious health condition"; and (3) only three weeks of leave remained available to Aboulhosn when he commenced his six-month leave.

### 1. Whether Aboulhosn Timely Submitted the Required Certification

Under the FMLA, "an employer may require that a request for leave ... be supported by a certification issued by the health care provider of the eligible employee or of the ... parent of the employee[,]" in which case "[t]he employee shall provide, in a timely manner, a copy of such certification to the employer." 29 U.S.C. § 2613(a); see also 29 C.F.R. § 825.305(a); *Lewis v. United States,* 641 F.3d 1174, 1176 (9th Cir.2011) ("The employing agency may require that the employee provide a medical certification to support an FMLA request for leave"); *Golez,* 2012 WL 3134256 at *2 ("An employer may also require an employee desiring FMLA leave in order to care for a parent to support the need for such leave with a certification from the parent's health care provider"); see also *Cavanaugh v. So. Cal. Permanente Med. Grp., Inc.,* 583 F.Supp.2d 1109, 1126 (C.D.Cal.2008) ("Regulations under the FMLA clearly allow employers to require an employee to procure medical certification to verify the employee's serious health condition before FMLA leave is granted," citing 29 C.F.R. § 825.305(a)). An employer's request for certification should be in writing. 29 C.F.R. § 825.305(a) ("An employer must give notice of a requirement for certification each time a certification is required; such notice must be written notice").

■ An employer may deny FMLA coverage for a requested leave if the employee fails to provide a certification within fifteen calendar days after receipt of the request. 29 C.F.R. § 825.313(b); see also *Alcala v. Best Buy Stores, LP,* No. EDCV 11–00798–JVS, 2012 WL 6138332, *13 (C.D.Cal. Nov. 7, 2012). The fifteen-day period begins to run on the date the employee receives written notice from his employer that documentation is required by a certain date, even if he does not receive the employer's certification form until a later date. *Rager v. Dade Behring, Inc.,* 210 F.3d 776, 778 (7th Cir.2000) ("Rager argues that the 15 day period of notice to

which the Act entitled her began to run ... when she received the 'Certification of Health Provider' form.... The company argues that the 15 day period began when Rager requested family leave on December 19.... Neither is correct. Remember that the Act does not require the employer to request medical documentation on a particular form. All that is required is that the employee be informed in writing that he or she has 15 days in which to submit proof of a serious health condition, and of the consequences if it is not submitted within the deadline, which in this case was termination because in the absence of an entitlement under the Family and Medical Leave Act the plaintiff had no excuse for being absent from work").

■ This deadline can be tolled, however, if warranted by the employer's conduct or if the employee cannot reasonably have been expected to act within fifteen days. *Rager*, 210 F.3d at 778–79; see also 29 C.F.R. § 825.305(b) ("The employee must provide the requested certification to the employer within 15 calendar days after the employer's request, *unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts* or the employer provides more than 15 calendar days to return the requested certification" (emphasis added)); *id.*, § 825.313(a) ("if an employee has 15 days to provide a certification and does not provide the certification for 45 days *without sufficient reason for the delay*, the employer can deny FMLA protections for the 30–day period following the expiration of the 15–day time period, if the employee takes leave during such period" (emphasis added)); *Peter v. Lincoln Tech. Inst., Inc.*, 255 F.Supp.2d 417, 441 (E.D.Pa.2002) ("The FMLA contains a built-in equitable provision in its regulations, specifying that an employee must submit requested medical certification "within the time frame requested by the employer (which must allow at least 15 calendar days after the employer's request), unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts." In general, what is practicable in terms of timing is based on the facts and circumstances of each case and is a question for the jury"); see also *Shaaban v. Covenant Aviation Sec.*, No. CV 08–03339 CR, 2009 WL 3817473, *5–6 (N.D.Cal. Nov. 10, 2009) (noting that in the context of the FMLA's 15 day deadline for employees to obtain medical documentation, "the regulations specifically provide[ ] for tolling," citing § 825.305(b)).

■ Merrill Lynch contends that it first sent written notice to Aboulhosn that he was required to provide a completed health care provider certification on or before June 8, 2010 in a letter dated May 24, 2010.[110] It contends that Aetna sent a written reminder dated May 28, 2010, which again stated that Aboulhosn had to submit a completed certification form by June 8, 2010.[111] There is no evidence that Aboulhosn made "diligent, good faith" attempts to obtain the forms from his brother, complete the certification, or return the certification during the fifteen days between May 24 and June 8, 2010 (or by June 12, fifteen days after May 28). Consequently, if Aboulhosn received either the May 24 or May 28 letters from Aetna, he failed to submit the required certification in a timely fashion.

Aboulhosn, however, disputes that Aetna sent the May 24 letter,[112] and asserts that he never received it.[113] He argues there is no evidence that the May 24 letter was

---

110. UF, ¶ 37; SS, ¶ 37.

111. UF, ¶ 39; SS, ¶ 39.

112. UF, ¶¶ 36, 39; SS, ¶¶ 36, 39.

113. UF, ¶ 36; SS, ¶ 36.

written or sent on May 24 beyond the fact that it is dated May 24.[114] Aboulhosn notes that the declaration of Aetna representative Monique Smith states only that Aetna maintains the May 24, 2010 letter in the claims file it established pertaining to Aboulhosn's May 21, 2010 leave request.[115] She does not state the letter was sent.[116] Merrill Lynch has adduced no other evidence that the letter was actually sent or received by Aboulhosn.

Aboulhosn also notes that before he left for Lebanon, he told Aetna to mail communications to his home address; [117] despite this, Aetna sent the May 24 letter to Aboulhosn's brother's address, even though it was purportedly sent before he left for Lebanon and before he notified Aetna that it should send correspondence to his brother's address.[118] Based on this record, the court concludes that triable issues of fact exist as to whether Aboulhosn actually received the May 24 letter.

Aboulhosn also disputes that Aetna sent the May 28 letter, and asserts that he did not receive this letter either. Although Merrill Lynch has adduced evidence that the letter was written to Aboulhosn at his brother's address sometime around the time Aboulhosn instructed Aetna to send mail to his brother's residence, it has adduced no evidence that the letter was actually sent or received by Aboulhosn. Aboulhosn states that the first time he saw the letter was after he was terminated; he contends it was in a stack of documents that were sent to him.[119] On this record, there are also triable issues of fact as to whether Aboulhosn ever received the May 28 letter. See *Webster v. Hilex Poly Co.,*

*LLC,* No. 1:06–cv–529–RLY–WTL, 2007 WL 2694650, *6 (S.D.Ind. Sept. 10, 2007) ("The facts in this case reflect that on December 2, 2005, Barton put a copy of the Certification of Medical Condition form in an envelope with Plaintiff's name on it and placed the envelope in Plaintiff's supervisor's mail box. Plaintiff claims that she never received the certification documentation. There being no other evidence, this issue comes down to Defendants' word against Plaintiff's. The court therefore finds a genuine issue of material fact exists as to whether Defendants put Plaintiff on notice"). If Aboulhosn never received the letter, it would not have been "practicable under the circumstances" for him to respond to it "despite ... diligent, good faith efforts." Accordingly, the court cannot grant Merrill Lynch's motion for summary judgment on Aboulhosn's FMLA claim on the ground that the undisputed evidence shows he failed to respond within fifteen days to the May 24 or May 28 requests for certification. It is undisputed that on June 17, 2010, Aboulhosn received notice of the certification requirement and a copy of the certification forms in an email sent by his Merrill Lynch manager, Jeffrey Smith.[120] If Aboulhosn failed to provide the certification to Aetna within 15 calendar days of June 17, 2010, therefore, Merrill Lynch was entitled to deny FMLA coverage for his requested leave. The only exception to this would be if it were not practicable for Aboulhosn to return the certification within that time frame despite diligent, good faith efforts. 29 C.F.R. § 825.313(b). The undisputed evidence shows that Aboulhosn completed the medi-

---

114. *Id.*

115. Smith Decl., ¶ 4.

116. *Id.*

117. UF, ¶ 33; SS, ¶ 33; Aboulhosn Decl., ¶ 14.

118. UF, ¶ 36; SS, ¶ 36; Aboulhosn Decl., ¶¶ 15–16.

119. Aboulhosn Decl., ¶ 17.

120. UF, ¶ 48; SS, ¶ 48.

cal certification form on June 22, 2010.[121] He attempted to send the certification to Aetna on June 23 and June 24.[122] The fact that Aetna did not receive the June 23 fax is uncontested.

The parties dispute, however, whether Aetna received the June 24 fax.[123] Merrill Lynch contends Aetna did not receive the certification Aboulhosn faxed on June 24.[124] Aboulhosn, on the other hand, asserts that he saw a confirmation on the computer screen indicating that the fax had gone through.[125] This dispute is sufficient to raise triable issues of fact as to whether Aetna received Aboulhosn's certification form on June 24.

If Aetna received the certification before July 2, 2010, a reasonable jury could find that it was timely submitted. As a consequence, the court cannot grant summary judgment in Merrill Lynch's favor on Aboulhosn's FMLA claim on the basis that Aboulhosn did not timely submit the required certification. For the reasons stated below, however, Aboulhosn has failed to raise triable issues concerning the fact that he was entitled to take FMLA leave.

### 2. Whether Aboulhosn's Leave Exceeded the Amount to Which He Was Entitled under the FMLA

As stated, the FMLA entitles an "eligible employee" to twelve workweeks of leave for certain family and health-related situations. 29 U.S.C. § 2612. Under Merrill Lynch's FMLA policy, Aboulhosn was entitled to twelve weeks of FMLA leave in any rolling twelve-month period.[126] It is undisputed that Aboulhosn took nine weeks of FMLA leave in August 2009 to bond with his newborn child.[127] At the time he commenced the leave at issue in this case, therefore, he had three weeks of FMLA leave available to him.[128]

Merrill Lynch argues that it did not interfere with Aboulhosn's FMLA leave because, given his request for a six month leave, he could not have returned to work before the expiration of his remaining FMLA leave. Stated differently, the six months' leave Aboulhosn requested to care for his father exceeded the three weeks of FMLA-protected leave he had available.[129] An employer only interferes with an employee's FMLA leave if the employee is entitled to leave. The undisputed evidence shows that Aboulhosn was entitled to only three weeks of FMLA leave at the time he sought leave to care for his father, because he had earlier taken nine weeks of FMLA leave in the same rolling twelve-month period. As a result, Merrill Lynch argues that Aboulhosn has no FMLA interference claim because he was entitled to only three weeks FMLA leave at the time he requested a six month leave.

---

121. UF, ¶ 75; SS, ¶ 75.

122. UF, ¶¶ 84–86; SS, ¶¶ 84–86.

123. UF, ¶ 88; SS, ¶ 88.

124. *Id.*

125. *Id.*

126. UF, ¶ 19; SS, ¶ 19.

127. UF, ¶ 12; SS, ¶ 12.

128. Aboulhosn notes that he was entitled to a total of 26 weeks of unpaid leave within a rolling twelve month period under Merrill Lynch's family care leave policy. Only twelve of those weeks could qualify as job-protected leave under the FMLA, however. The fact that Aboulhosn was entitled to 26 weeks of family care leave under Merrill Lynch's policy does not demonstrate that he was entitled to 26 weeks of FMLA leave. Merrill Lynch's family care leave and the statutorily-required FMLA leave are two distinct categories of leave. Only FMLA leave is protected by the FMLA. This distinction is recognized in Merrill Lynch's Handbook. (Anderson Decl., Exh. A at 10.)

129. UF, ¶¶ 74, 76; SS, ¶¶ 74, 76.

■ Merrill Lynch concedes, however, that Aboulhosn had three weeks of FMLA leave available to him at the time he commenced his leave. Even if Aboulhosn cannot show that Merrill Lynch interfered with his rights under the FMLA for the entire six month leave period, he can assert a claim against Merrill Lynch for interference with the three weeks of FMLA leave he was entitled to take if he can demonstrate he was otherwise entitled to that leave. The fact that Aboulhosn requested more leave than he was entitled to take under the FMLA does not immunize Merrill Lynch from liability for interference with any remaining FMLA leave Aboulhosn had available. As discussed *infra*, however, Aboulhosn was not entitled to take even three weeks of FMLA leave to care for his father, because the kind of care he provided is not FMLA-protected.

### 3. Whether the FMLA Provides Protection for the Kind of Care Aboulhosn Was Providing to His Father

The FMLA grants up to twelve weeks of leave per year to eligible employees in various circumstances; these include situations in which the employee must care for a parent with a "serious health condition." *Golez*, 2012 WL 3134256 at *2 (citing 29 U.S.C. § 2612(a)(1)(C); 29 C.F.R. § 825.113; 29 C.F.R. § 825.201(a)). A "serious health condition" entitling an employee to FMLA leave means "an illness, injury, impairment or physical or mental condition that involves inpatient care … or continuing treatment by a health care provider." 29 C.F.R. § 825.113(a). "Inpatient care means an overnight stay in a hospital, hospice, or residential medical care facility[.]" *Id.*, § 825.114. A "serious health condition involving continuing treatment by a health care provider" includes: "[a] period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition," as well as "[a] period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective." *Id.* § 825.115. Incapacity means "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." *Id.*, § 825.113(b).

■ There is no evidence that Aboulhosn's father required inpatient care during the relevant period.[130] There is also no evidence that Aboulhosn's father was incapacitated during the relevant period. The certification Aboulhosn completed does not state that his father was incapacitated; instead, it left the section regarding incapacity blank.[131] The certification affirmatively states that the medical condition from which Aboulhosn's father suffered did not cause periodic flare-ups that prevented him from participating in normal daily activities.[132] It undisputed, moreover, that Aboulhosn's father was able to move, to exercise, and to transport himself to doctor appointments; he did not need Aboulhosn's assistance to visit his treating physicians.[133] Aboulhosn thus has adduced no evidence that his father was unable to work or perform regular daily activities during the relevant time period. The court concludes, as a result, that he has failed to raise triable issues of fact as to whether his father had a "serious health condition" that would have entitled Aboul-

---

130. See UF, ¶ 71; SS, ¶ 71 (Aboulhosn adduced evidence only that his father had surgery in 2006); UF, ¶ 77; SS, ¶ 77 ("the certification notes that the [p]laintiff's father was not admitted over night to the hospital for medical care").

131. UF, ¶ 78; SS, ¶ 78.

132. UF, ¶ 81; SS, ¶ 81.

133. UF, ¶¶ 97–98; SS, ¶¶ 97–98.

hosn to FMLA protection during the relevant time period.

Even assuming Aboulhosn's father had a "serious health condition," there is no evidence that Aboulhosn "needed to care for" the father. For FMLA purposes, an employee is "needed to care for" a family member when, "because of a serious health condition, the family member is unable to care for his or her own basic medical, hygienic, or nutritional needs or safety, or is unable to transport himself or herself to the doctor. The term also includes providing psychological comfort and reassurance which would be beneficial to a ... parent with a serious health condition who is receiving inpatient or home care." 29 C.F.R. § 825.124. As noted, there is no evidence that Aboulhosn's father was receiving inpatient or home care. There is also no evidence that Aboulhosn's father was unable to care for his basic medical, hygienic, or nutritional needs or safety, or was unable to transport himself to the doctor. To the contrary, the undisputed evidence indicates that Aboulhosn's father was able to get to the doctor,[134] and that he could care for his own daily activities.[135] Although

there is evidence that Aboulhosn accompanied his father while he took his medication, ate, and exercised, and that Aboulhosn perhaps assisted his father with those activities,[136] there is no evidence that Aboulhosn's father was unable to tend to his own basic needs without Aboulhosn's care. For this reason alone, it is appropriate to grant summary judgment for Merrill Lynch on Aboulhosn's FMLA claim.

Aboulhosn argues that the absence of evidence concerning his father's incapacity is irrelevant, because Merrill Lynch never requested that he supplement the medical certification he provided concerning his father's illness. He argues that an employer waives its ability to argue, as a defense to an FMLA claim, that the employee's family member did not suffer from a "serious health condition," if it does not request additional medical documentation and a second opinion from a medical provider under 29 U.S.C. § 2613. Aboulhosn, however, cites to no authority holding that a plaintiff can prevail on an FMLA claim against his employer without demonstrating that the leave he sought was associated with a "serious health condition."[137]

---

**134.** *Id.*

**135.** UF, ¶ 81; SS, ¶ 81 (citing Aboulhosn Depo. at 160:22–161:1; Exh. E at 5 (certification reporting that Aboulhosn's father's condition did not cause flare-ups preventing him from participating in normal daily activities)).

**136.** UF, ¶ 99; SS, ¶ 99.

**137.** At the hearing, Aboulhosn referred the court to the Ninth Circuit's decision in *Bachelder* as support for his waiver argument. In *Bachelder*, however, there was no dispute that plaintiff sought leave for a "serious health condition." 259 F.3d at 1130 n. 18 ("To establish that her February 1996 absences qualify as FMLA leave, Bachelder also had to have suffered from a 'serious health condition.' ... [Defendant] has not disputed that th[is] condition[ ] [was] met"). The *Bachelder* court held, moreover, that plaintiff's absences were covered by the FMLA. The decision does not, consequently, support

Aboulhosn's argument that a plaintiff can prevail on an FMLA claim without adducing evidence that he was entitled to FMLA leave. See *id.* at 1125 ("[O]ur analysis is fairly uncomplicated. Much as it should be obvious that the FMLA is not implicated and does not protect an employee against disciplinary action based upon [ ] absences if those absences are not taken for one of the reasons enumerated in the Act, the FMLA is implicated and does protect an employee against disciplinary action based on her absences if those absences are taken for one of the Act's enumerated reasons" (internal quotation marks and citations omitted)); see also *Rankin v. Seagate Techs., Inc.,* 246 F.3d 1145, 1147 (8th Cir. 2001) ("Where absences are not attributable to a 'serious health condition,' ... FMLA is not implicated and does not protect an employee against disciplinary action based upon such absences").

Aboulhosn's argument, moreover, is contradicted by binding authority. In *Marchisheck v. San Mateo Cnty.*, 199 F.3d 1068, 1076 (9th Cir.1999), the Ninth Circuit rejected the plaintiff's argument that her employer was precluded from denying that her son had a "serious health condition" because it had not requested a second medical certification regarding his condition. The court noted that the doctor's letter plaintiff gave the employer was not a proper certification and did not establish that the son had a "serious health condition." *Id.* at 1077. It observed that there was "no provision [in] the FMLA itself, or [in] the relevant administrative rules, that even arguably estop[ped] [d]efendant from disputing the contents of the letter [under] such circumstances." *Id.* Because plaintiff did not adduce evidence that her son had a "serious health condition" entitling her to take FMLA leave to care for him, the Ninth Circuit affirmed the district court's grant of summary judgment to defendant on her FMLA claim. *Id.* at 1078.

As observed by the Ninth Circuit, the insufficiency of the doctor's letter in *Marchisheck* distinguished the facts of that case from *Sims v. Alameda–Contra Costa Transit Dist.*, 2 F.Supp.2d 1253 (N.D.Cal. 1998). In *Sims*, the court held that an employer waives its right to litigate whether the employee had a "serious health condition" if it fails to challenge an initial medical certification through the administrative process provided by § 2613 *and* if the initial certification was sufficient to establish that he had such a condition. *Id.* at 1264 ("If this initial certification sufficiently establishes that Sims had a serious health condition, AC Transit, having failed to exhaust the second and third-opinion process, is not entitled to challenge that medical finding now"); see also *id.* at 1268 ("[T]he court concludes that where an employee's initial medical certification estab-

lishes that he had a serious health condition, and the employer fails to require the employee to obtain a second medical opinion (and a third if the first two conflict), the employer waives its right to later contest the veracity of the initial medical certification and argue that the employee did not have a serious medical condition at the time of his absence").

For reasons already stated, the certification Aboulhosn provided does not establish that Aboulhosn's father had a "serious health condition." Consequently, the waiver rule stated in *Sims* does not apply. *Id.* As in *Marchisheck*, there is no evidence, in the certification or otherwise, that Aboulhosn sought leave to care for a "serious health condition" of his father. Like the defendant in *Marchisheck*, therefore, Merrill Lynch is entitled to have summary judgment entered in its favor on Aboulhosn's FMLA claim.

## C. Aboulhosn's Claim for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing

■ Aboulhosn alleges that Merrill Lynch breached its contractual obligations to him by terminating his employment prior to the expiration of the family medical leave Merrill Lynch agreed to provide to him.[138] To plead a breach of contract claim under California law, a plaintiff must allege: (1) the existence of a contract; (2) performance of the contract, or a legally cognizable excuse for nonperformance; (3) defendants' breach; and (4) resulting damage. *First Commercial Mortgage Co. v. Reece*, 89 Cal.App.4th 731, 745, 108 Cal. Rptr.2d 23 (2001); *Careau & Co. v. Security Pacific Business Credit, Inc.*, 222 Cal. App.3d 1371, 1388, 272 Cal.Rptr. 387 (1990). Merrill Lynch seeks summary judgment on Aboulhosn's claim for breach

---

**138.** Complaint, ¶¶ 69–72.

of employment contract, asserting that his employment was expressly "at will."

■ California Labor Code § 2922 provides that "[a]n employment, having no specified term, may be terminated at the will of either party on notice to the other." CAL. LABOR CODE § 2922. At-will employment "is terminable at any time without cause," *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 680, 254 Cal.Rptr. 211, 765 P.2d 373 (1988), and is not subject to any procedural prerequisites except the statutory requirement of notice, see, e.g., *Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 335, 100 Cal.Rptr.2d 352, 8 P.3d 1089 (2000).

■ While the statutory presumption of at-will employment is strong, it can be rebutted by evidence of the parties' contrary intent. This includes evidence of an express contract "limiting the employer's right to discharge the employee." *Foley*, 47 Cal.3d at 665, 254 Cal.Rptr. 211, 765 P.2d 373 (internal citations omitted). It also includes evidence of an implied-in-fact contract arising from conduct that shows a mutual intent to limit the at-will doctrine. *Guz*, 24 Cal.4th at 336, 100 Cal.Rptr.2d 352, 8 P.3d 1089 (citing *Foley*, 47 Cal.3d at 680, 254 Cal.Rptr. 211, 765 P.2d 373). See also *Foley*, 47 Cal.3d at 677, 254 Cal.Rptr. 211, 765 P.2d 373 ("The absence of an express written or oral contract term concerning termination of employment does not necessarily indicate that the employment is actually intended by the parties to be at-will, because the presumption of at-will employment may be overcome by evidence of contrary intent").

■ In *Foley*, the California Supreme Court identified several factors that are relevant in determining whether an implied agreement limiting the employer's right to terminate an employee exists. These include " 'the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assur-ances of continued employment, and the practices of the industry in which the employee is engaged.' " *Foley*, 47 Cal.3d at 680, 254 Cal.Rptr. 211, 765 P.2d 373 (quoting *Pugh v. See's Candies, Inc.*, 116 Cal. App.3d 311, 327, 171 Cal.Rptr. 917 (1981)). "[T]he totality of the circumstances determines the nature of the contract," the *Foley* Court stated, and " 'the acts and conduct of the parties [should be] interpreted in the light of the subject matter and of the surrounding circumstances.' " *Id.* at 681, 254 Cal.Rptr. 211, 765 P.2d 373 (quoting *Pugh*, 116 Cal.App.3d at 329, 171 Cal. Rptr. 917); *Estes v. AlliedSignal, Inc.*, C 97–1810 MHP, C 97–3102 MHP, 1998 WL 814638, *12 (N.D.Cal. Nov. 12, 1998) ("The existence of an implied contract of employment turns on the intent of the parties. Courts look to the totality of the circumstances surrounding a plaintiff's employment to determine the intent of the parties and the existence of an implied contract. Factors to be considered are: (1) the employer's personnel policies and procedures; (2) the employee's longevity of service; (3) the employer's communications or actions 'reflecting assurances of continued employment'; (4) apparent lack of criticism; and (5) practices of the industry in which the employee is engaged" (citations omitted)).

■ Aboulhosn bears the burden of proving that the parties entered into an implied contract limiting Merrill Lynch's ability to terminate him at will. *Foley*, 47 Cal.3d at 682, 254 Cal.Rptr. 211, 765 P.2d 373 (stating that the party relying on an implied contract not to terminate absent good cause carries the burden of proving its existence at trial). To survive Merrill Lynch's motion for summary judgment, therefore, Aboulhosn must adduce evidence raising triable issues of fact regarding the existence of such a contract. See *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

Aboulhosn contends that Merrill Lynch breached its contractual obligations to him by terminating his employment in violation of the family care leave policies set forth in the Handbook. Merrill Lynch argues that Aboulhosn's breach of contract claim fails because his employment was at-will and because the Handbook is not a contract. "[A] company policy, such as that evidenced in a handbook or employer policy memorandum, may give rise to a contract between employer and employee, even absent formal offer and acceptance," however. *Karrer v. Best Buy Co., Inc.*, No. LA CV 11–07697 JAK, 2012 WL 1957586, *3 (C.D.Cal. May 24, 2012). Where an employee handbook expressly states that it is not intended to constitute a contract or to limit the employer's ability to terminate its employees at will, however, courts have generally held that the handbook does not give rise to contractual rights. See *Ashbey v. Archstone Property Management, Inc.*, No. SACV 12–0009 DOC (RNBx), 2012 WL 1269122, *6 (C.D.Cal. Apr. 13, 2012) ("several California courts and district courts in California hold that no contract is created where an employer's documents state that its handbook does not create contractual rights, even if an employee signs a form agreeing to adhere to the employment handbook's policies," citing *Haggard v. Kimberly Quality Care, Inc.*, 39 Cal.App.4th 508, 515, 522–23, 46 Cal.Rptr.2d 16 (1995) (reversing a jury verdict for an employee on the basis that no contract was formed when the employee signed a form stating: "I am responsible for knowing and adhering to the Policies" in the handbook because the handbook stated it was "not intended to give rise to contractual rights

or obligations")); *Bianco v. H.F. Ahmanson & Co.*, 897 F.Supp. 433, 439–40 (C.D.Cal.1995) ("An employee handbook which states on its face that it 'is not intended to constitute or create, nor is it to be construed to constitute or create, the terms of an employment contract' cannot be a promise or a commitment to future behavior. Plaintiff has presented no other evidence of a written employment contract. Therefore, the Court concludes that Defendants motion for summary adjudication on the second cause of action must be granted"); *Am. Mortg. Network v. LoanCity.com*, D044550, 2006 WL 3199291, *10 (Cal.App. Nov. 7, 2006) ("Case authority supports the proposition that an employee handbook containing ... an express disclaimer that it is not a binding contract creates no enforceable contractual rights," citing *Haggard*, 39 Cal.App.4th at 522–23, 46 Cal.Rptr.2d 16).[139] See also *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1138 (9th Cir.2003) (stating that "California law presumes at-will employment where contract terms do not specify otherwise," and that "[w]hile California courts will look to factors such as employer personnel policies, longevity of service, and assurances of continued employment in determining whether the employer's conduct 'gave rise to an implied-in-fact contract,' they have been careful not to interpret such factors too liberally," and holding, in light of employee's short term of employment and "explicit at-will provisions contained in her employment letter and employee handbook" that "no implied-in-fact contract was created that limited Amway's ability to terminate employment at any time").

**139.** "Although the court is not bound by unpublished decisions of intermediate state courts, unpublished opinions that are supported by reasoned analysis may be treated as persuasive authority." *Scottsdale Ins. Co. v. OU Interests, Inc.*, No. C 05–313 VRW, 2005 WL 2893865, *3 (N.D.Cal. Nov. 2, 2005) (citing *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential value")).

 Here, it is uncontroverted that the Handbook states that its provisions "do not establish enforceable employee rights, contractual or otherwise, and ... do not establish an employment relationship enforceable by associates."[140] The Handbook also states that it does not limit Merrill Lynch's right to terminate associates at will.[141] The court finds, accordingly, that the provisions of the Handbook did not give rise to a binding employment contract that limited Merrill Lynch's ability to terminate Aboulhosn's employment. *Id.* Consequently, insofar as Aboulhosn's breach of contract claim is based on allegations that Merrill Lynch terminated him in breach of the Handbook, the claim fails.[142]

 Aboulhosn's claim that Merrill Lynch breached the covenant of good faith and fair dealing implied in his employment contract with it is based on the existence of an employment contract. As Aboulhosn asserts, the law implies in every contract a covenant of good faith and fair dealing. *Comunale v. Traders & General Ins. Co.,* 50 Cal.2d 654, 658, 328 P.2d 198 (1958). For the reasons stated, however, the Handbook is not an employment contract. Aboulhosn identifies no other employment contract that was allegedly breached by Merrill Lynch's decision to terminate him. He has thus failed to adduce evidence of that Merrill Lynch deprived him of the right to receive the benefits of his employment contract. The court therefore grants Merrill Lynch's motion for summary judgment on Aboulhosn's breach of contract/breach of implied covenant claim. See *Bianco,* 897 F.Supp. at 441 ("Plaintiff alleges that Defendants, in terminating

Plaintiff's employment without just cause, breached the covenant of good faith and fair dealing.... Plaintiff has failed to produce evidence sufficient to establish that Plaintiff and Defendants entered into an employment contract. Consequently, Plaintiff has failed to produce evidence sufficient to demonstrate that Defendants did anything to injure Plaintiff's right to receive the benefits of the contract.... Accordingly, Defendants are entitled to summary judgment," citing *Foley,* 47 Cal.3d at 684, 254 Cal.Rptr. 211, 765 P.2d 373; *Comunale,* 50 Cal.2d at 658, 328 P.2d 198).

### D. Merrill Lynch's Counterclaim

### 1. Whether The Court Will Grant Merrill Lynch Summary Judgment On Its Counterclaim

Merrill Lynch asserts a counterclaim against Aboulhosn for breach of the Note. The elements of a claim for breach of a promissory note are the same as those for any breach of contract claim: existence of an enforceable agreement; Merrill Lynch's performance by payment of the loan proceeds; and Aboulhosn's breach in the form of a failure to repay. See *Engeleiter v. Shin,* 956 F.2d 274, 1992 WL 33930, *1 (9th Cir. Feb. 25, 1992) (Unpub. Disp.); *Student Loan Marketing Ass'n v. Hanes,* 181 F.R.D. 629, 633 (S.D.Cal.1998); *Swanson v. Skiff,* 92 Cal.App.3d 805, 808–09, 155 Cal.Rptr. 280 (1979).

 It is undisputed that the parties executed a promissory note on February 10, 2009, pursuant to which BAI agreed to loan Aboulhosn $550,415, and Aboulhosn

---

140. UF, ¶ 15; SS, ¶ 15.

141. *Id.*

142. Aboulhosn argues that even if Merrill Lynch had no contractual obligation to follow its leave policy, it had an obligation to comply with the FMLA. (Opp. at 19.) While this may

be true, Merrill Lynch's obligations under the FMLA cannot save Aboulhosn's breach of contract claim, which depends on the existence of a contractual relationship that made his employment other than at will. For the reasons stated, moreover, Merrill Lynch is entitled to summary judgment on Aboulhosn's FMLA claim.

agreed to repay the loan plus interest at 5% per annum or the applicable federal rate, whichever was higher, in six yearly installments.[143] BAI actually paid $550,415 to Aboulhosn on or about February 17, 2009.[144] Under the terms of the Note, it became immediately due and payable on the termination of Aboulhosn's termination on July 1, 2010.[145] Aboulhosn has not repaid the loan; he has made only one payment of $91,735.84.[146] Merrill Lynch has therefore adduced uncontroverted evidence establishing each of the elements of its counterclaim.

Aboulhosn argues, however, that Merrill Lynch breached the covenant of good faith and fair dealing implied in the Note, excusing his performance. As stated, California law recognizes that "every contract contains an implied covenant of good faith and fair dealing that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *Das v. WMC, Mortg. Corp.*, 831 F.Supp.2d 1147, 1164 (N.D.Cal. 2011) (citing *Wolf v. Walt Disney Pictures and Television*, 162 Cal.App.4th 1107, 1120, 76 Cal.Rptr.3d 585 (2008)); see also *Comunale*, 50 Cal.2d at 658, 328 P.2d 198. In some contexts, courts have found that a party's breach of the implied covenant relieves the other party of its obligations under the contract. See *Liberty Mut. Ins. Co. v. Altfillisch Const. Co.*, 70 Cal.App.3d 789, 797, 139 Cal.Rptr. 91 (1977) (breach of the implied covenant by an insured relieved the insurer of any obligation to pay damages under the insurance contract); see also *Weiss v. Salamone*, 116 A.D.2d 1009, 1010, 498 N.Y.S.2d 630 (N.Y.App.Div.

1986) ("The gravamen of defendant's claims and defenses is that plaintiff acted in a manner which rendered defendant's shares of the corporation valueless, that plaintiff thus breached an implied covenant of good faith not to impair the value of the consideration given by him, and that plaintiff's breach of contract justified defendant in suspending his payments on the note. These are claims that may be asserted as defenses to a contract action"); *Commercial Capital Corp. v. Manor Collection, LLC*, No. CV 990089645, 2000 WL 967967, *3 (Conn.Super. May 4, 2000) (Unpub. Disp.) (noting that delay in instituting an action to recover the collateral securing a note or a money judgment has been held "to constitute a legally sufficient defense based on the implied covenant of good faith and fair dealing"); cf. *Green v. Super. Ct.*, 10 Cal.3d 616, 631 & n. 22, 111 Cal. Rptr. 704, 517 P.2d 1168 (1974) (holding that a tenant can raise the landlord's breach of an implied warranty of habitability as a defense in an unlawful detainer action).

Aboulhosn does not clearly identify the actions of Merrill Lynch that he believes breached the implied covenant. His opposition suggests, however, that Merrill Lynch frustrated his ability to receive the benefits of the promissory note by terminating him in order to "steal" his book of business.[147] "[T]he scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract[.]" *Cabo Brands, Inc. v. MAS Beverages, Inc.*, No. 8:11–cv–1911–ODW(ANx), 2012 WL

---

**143.** Counterclaim UF, ¶ 3; Counterclaim SS, ¶ 3.

**144.** Counterclaim UF, ¶ 2; Counterclaim SS, ¶ 2.

**145.** Counterclaim UF, ¶ 6; Counterclaim SS, ¶ 6.

**146.** Counterclaim UF, ¶¶ 20–21; Counterclaim SS, ¶ 20–21.

**147.** Counterclaim Opp. at 5–6.

6021665, *2 (C.D.Cal. Dec. 4, 2012) (citing *Carma Dev., Inc. v. Marathon Dev. Cal., Inc.,* 2 Cal.4th 342, 373, 6 Cal.Rptr.2d 467, 826 P.2d 710 (1992)). The court must therefore examine the express terms of the Note and consider its purpose to determine if Merrill Lynch violated the implied covenant by engaging in the acts described by Aboulhosn. *Id.*

The Note expressly states that it "does not constitute an agreement by BAI to employ Employee for a specified period of time, and Employee's employment may be terminated at any time, with or without notice or cause." [148] The express terms of the Note do not, therefore, demonstrate that the parties intended to limit Merrill Lynch's ability to terminate Aboulhosn. To the contrary, the Note confirms Merrill Lynch's ability to discharge him with or without cause at any time. The express terms of the Note thus do not indicate that Merrill Lynch breached the implied covenant contained therein by terminating Aboulhosn. See *Boatright v. Aurora Loan Servs.,* No. C–12–00009 EDL, 2012 WL 2792415, *13 (N.D.Cal. July 9, 2012) ("an implied covenant of good faith and fair dealing cannot contradict the express terms of a contract," citing *Carma Dev.,* 2 Cal.4th at 373, 6 Cal.Rptr.2d 467, 826 P.2d 710); see also *Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC,* 185 Cal. App.4th 1050, 1061, 111 Cal.Rptr.3d 173 (2010) ("The implied covenant cannot contradict the express terms of a contract"); *Storek & Storek, Inc. v. Citicorp Real Es-*

*tate, Inc.,* 100 Cal.App.4th 44, 55, 122 Cal. Rptr.2d 267 (2002) ("The Supreme Court has clarified, however, that an implied covenant of good faith and fair dealing cannot contradict the express terms of a contract," citing *Carma Dev.,* 2 Cal.4th at 374, 6 Cal.Rptr.2d 467, 826 P.2d 710).

██ Aboulhosn asserts, nonetheless, that his termination frustrated the express purpose of the Note and denied him the ability to receive the benefits the Note granted him. A party breaches the implied covenant if its conduct, "whether or not it also constitutes a breach of a consensual contract term, demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.,* 222 Cal.App.3d 1371, 1395, 272 Cal.Rptr. 387 (1990). Aboulhosn contends that the purpose of the Note was to grant him a "bonus" upon completion of 18 months employment for successfully maintaining and/or increasing the assets he had under management during that period.[149] He also asserts (without evidentiary support) that the Note was designed to create a disincentive for him to move his business to another company.[150]

---

**148.** UF, ¶¶ 5; SS, ¶ 5.

**149.** Aboulhosn Decl., ¶ 4; *id.,* ¶ 6. Merrill Lynch objects to Aboulhosn's assertion that the Note was intended as a means of structuring bonus payments. (Defendant's Objections to Marwan Aboulhosn's in Support of Opposition to Defendant's Motion for Summary Judgment Re: Defendant's Counterclaim, Docket No. 47 (Feb. 8, 2013)). It notes that Aboulhosn also signed an "Important Ac-

knowledgment Form" which stated that the loan was not a bonus. (Counterclaim UF, ¶¶ 9–11; Counterclaim SS, ¶¶ 9–11.) The court need not resolve this evidentiary dispute, however, because even accepting Aboulhosn's factual representations as true, he is unable to demonstrate that Merrill Lynch breached a covenant implied in the Note.

**150.** Counterclaim Opp. at 2.

■ It is undisputed that Aboulhosn received $550,415 from BAI on or about February 17, 2009.[151] Aboulhosn thus received the benefit guaranteed him by the face of the Note. Aboulhosn states, moreover, that he received one "sanitized" payment of a "bonus" under the Note, when he paid Merrill Lynch $91,753.83 and Merrill Lynch paid that amount back to him less taxes and employee deductions.[152] According to Aboulhosn's own declaration, therefore, he received the benefit the parties purportedly intended him to receive under the Note. Aboulhosn adduces no evidence that the parties' agreed purpose in entering into the Note was to guarantee that he receive all six "bonus" installments whether or not he continued to work for Merrill Lynch. He also adduces no evidence that he had a reasonable expectation that he would receive all six "bonus" payments. To the contrary, the provisions of the Note and the concurrently signed Acknowledgment Form put him on notice that he could be terminated at any time, at which point the balance of the loan would become due and payable.[153] The court finds, therefore, that Aboulhosn has not raised triable issues of fact as to whether Merrill Lynch denied him the benefits of the Note.

Because Merrill Lynch has adduced uncontroverted evidence establishing all of the elements of its counterclaim for breach of the Note, and because Aboulhosn has failed to adduce evidence raising triable issues of fact concerning a breach by Merrill Lynch of the covenant of good faith and fair dealing implied in the Note, the court grants Merrill Lynch's motion for summary judgment on its counterclaim.

## 2. Whether Merrill Lynch Is Entitled to the Damages Award it Seeks

Merrill Lynch requests that the court enter judgment in its favor and against Aboulhosn for the principal balance due and owing on the promissory note—$458,679.60—as well as for interest at the rate of 5% per annum from February 10, 2010 through the date of payment in full of the promissory note.

■ "Whether a party is entitled to prejudgment interest depends on the applicable state law in diversity cases." *Baker v. Garden Grove Med. Investors, Ltd.,* 306 Fed.Appx. 393, 396 (9th Cir.2009) (citing *Oak Harbor Freight Lines, Inc. v. Sears Roebuck & Co.,* 513 F.3d 949, 961 (9th Cir.2008)). California law permits an award of prejudgment interest when damages have been awarded for breach of contract. CAL. CIV.CODE § 3287(b); *Gebert v. Yank,* 172 Cal.App.3d 544, 556, 218 Cal. Rptr. 585 (1985). The legal rate of interest on any unpaid balance is set by the terms of the contract. See CAL. CIV.CODE § 3289(a) ("Any legal rate of interest stipulated by a contract remains chargeable after a breach thereof, as before, until the contract is superseded by a verdict or other new obligation").

■ As noted, Aboulhosn executed a promissory note in which he agreed to repay $550,415 plus interest at 5% per annum.[154] The parties do not dispute that Aboulhosn made a payment of $91,735.83 to Merrill Lynch on February 9, 2010, and that Merrill Lynch forgave the interest due on the Note through that date.[155] Accordingly, the court finds that Merrill

---

151. Counterclaim UF, ¶ 2; Counterclaim SS, ¶ 2.

152. Aboulhosn Decl., ¶ 6.

153. Counterclaim UF, ¶ 11; Counterclaim SS, ¶ 11.

154. Counterclaim UF, ¶ 3; Counterclaim SS, ¶ 3.

155. Counterclaim UF, ¶ 15; Counterclaim SS, ¶ 15; Aboulhosn Decl., ¶ 6.

Lynch is entitled to prejudgment interest at the rate of 5% per annum from February 10, 2010 through the date of judgment. The court will therefore award Merrill Lynch $72,945.63 in prejudgment interest.

 As respects postjudgment interest, "[u]nder the provisions of 28 U.S.C. § 1961, postjudgment interest on a district court judgment is mandatory." *Air Separation, Inc. v. Underwriters at Lloyd's of London,* 45 F.3d 288, 290 (9th Cir.1995) (citing *Perkins v. Standard Oil Co.,* 487 F.2d 672, 674 (9th Cir.1973)). Postjudgment interest applies to the entire amount of the judgment, including principal, prejudgment interest, attorneys' fees, and costs. *Id.* at 291. Pursuant to federal statute, post judgment interest rate is set "at a rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding . . . the date of the judgment." 28 U.S.C. § 1961(c); see also *FCS Advisors, Inc. v. Fair Finance Co., Inc.,* 605 F.3d 144 (2d Cir.2010) ("[I]n a diversity case, state law governs the award of prejudgment interest but in contrast, postjudgment interest is governed by federal statute," quoting *Schipani v. McLeod,* 541 F.3d 158, 164–65 (2d Cir.2008)); *Forest Sales Corp. v. Bedingfield,* 881 F.2d 111, 112–13 (4th Cir.1989) The statutory post judgment interest rate applies unless the parties have explicitly contracted otherwise. See *Investment Service Co. v. Allied Equities Corp.,* 519 F.2d 508, 511 (9th Cir.1975) ("upon entry of the judgment the legal rate of interest applicable should apply unless the parties have agreed in the note that some other rate of interest shall apply"). As the Tenth Circuit explained in *In re Riebesell,* 586 F.3d 782, 794 (10th Cir.2009):

"Parties may contract to, and agree upon, a post judgment interest [rate] other than that specified in § 1961. But

to do so, they must specifically contract around the general rule that a cause of action reduced to judgment merges into the judgment and the contractual interest rate therefore disappears for post-judgment purposes. If parties want to override the general rule on merger and specify a post judgment interest rate, they must express such intent through clear, unambiguous and unequivocal language." *Id.* at 794 (internal quotation marks and citations omitted)

See also *FCS Advisors,* 605 F.3d at 147 ("parties are free to agree to a different postjudgment interest rate by contract, provided that they do so through 'clear, unambiguous and unequivocal language,'" citing *Westinghouse Credit Corp. v. D'Urso,* 371 F.3d 96, 100 (2d Cir.2004)).

 Merrill Lynch has not adduced evidence that the parties agreed, in "clear, unambiguous, and unequivocal language" to a post judgment interest rate other than that specified in § 1961; it has only presented evidence that the note provides for a 5% per annum interest rate on the loan. This is not sufficient to displace the statutory rate. See *Riebesell,* 586 F.3d at 794–95 (a promissory note's provision that "upon default and acceleration, the amount then due on the note 'shall accrue interest until payment at the rate of twenty-four percent (24%) per annum or the highest rate permitted by law, whichever is less,'" was not clear and unambiguous language specifying a postjudgment interest rate, so the federal rate set forth in § 1961 applied); see also *FCS Advisors, Inc.,* 605 F.3d at 148 (holding that § 1961 applied where the parties' agreement did not specify that the stated interest rate applied either to judgments or judgment debts); *Jack Henry & Assocs., Inc. v. BSC, Inc.,* 753 F.Supp.2d 665, 670 (E.D.Ky.2010) (a provision in an agreement stating that "amounts outstanding after the due date

are subject to an interest charge to date of payment of the lesser of 18% per annum or the highest legally allowable rate" did not constitute "an agreement on postjudgment interest sufficient to displace the interest rate specified in § 1961" because "[s]imply specifying a general interest rate for debts under a contract does not constitute an agreement on postjudgment interest," and "because, under federal law, once a claim is reduced to judgment, the original claim is extinguished and merged into the judgment; and a new claim, called a judgment debt, arises," quoting *Kotsopoulos v. Asturia Shipping Co.*, 467 F.2d 91, 95 (2d Cir.1972)). Consequently, Merrill Lynch is only entitled to post-judgment interest at the rate set by § 1961: 0.12% per annum.[156]

Merrill Lynch also seeks the costs of collection and of this proceeding, including attorneys' fees, the sum of which is "unknown at this time."[157] Merrill Lynch may file an appropriate motion for attorneys' fees and costs under Local Rule 54–10.

### III. CONCLUSION

For the reasons stated, the court grants Merrill Lynch's motion for summary judgment on the claims asserted in Aboulhosn's complaint. It also grants Merrill Lynch's motion for summary judgment on its counterclaim. The court will therefore enter judgment for Merrill Lynch on its counterclaim, awarding $458,679.16 in principal and $72,945.63 in prejudgment interest. The court grants Merrill Lynch's request for post judgment interest at an annual rate of 0.12%.

### JUDGMENT

On April 16, 2013, the court entered an order granting defendant Merrill Lynch's

motion for summary judgment on the claims asserted in plaintiff Marwan Aboulhosn's complaint. The court's order also granted Merrill Lynch's motion for summary judgment on its counterclaim against Aboulhosn. Accordingly,

IT IS ORDERED AND ADJUDGED

1. That Aboulhosn take nothing by way of his complaint;

2. That Merrill Lynch recover the principal sum of $458,679.16 and prejudgment interest of $72,945.63 from Aboulhosn on its counterclaim. This judgment shall bear post judgment interest at an annual rate of 0.12%;

3. That the action be, and it hereby is, dismissed.

---

**156.** See Federal Reserve Statistical Release, (April 8, 2013), http://www.federalreserve.gov/releases/h15/current/default.htm.

